No. 73,851

THE STATE BOARD OF NURSING and STATE OF KANSAS *ex rel.*
STATE BOARD OF HEALING ARTS, *Appellants,* v. E. MICHELLE
RUEBKE, *Appellee.*

(913 P.2d 142)

600

Opinion filed March 15, 1996.

*Mark S. Braun*, assistant attorney general, argued the cause and was on the brief for appellant State Board of Nursing.

*Mark W. Stafford*, special assistant attorney general, argued the cause and was on the briefs for appellant State Board of Healing Arts.

*Kathryn Gardner*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: The State Board of Healing Arts (Healing Arts) and the State Board of Nursing (Nursing) appeal the trial court's denial of a temporary injunction by which the Boards had sought to stop E. Michelle Ruebke, a practicing lay midwife, from continuing her alleged practice of medicine and nursing.

The trial court found that (1) certain provisions of both the Kansas Healing Arts Act, K.S.A. 65-2801 *et seq.*, and the Kansas Nursing Act, K.S.A. 65-1113 *et seq.*, were unconstitutionally vague; (2) Ruebke's practices incident to her lay midwifery were not within the scope of either act; and (3) even if the acts were held to be constitutional and Ruebke fell within their practice definitions, she was exempted from coverage under both acts because of certain exceptions.

We have jurisdiction pursuant to K.S.A. 60-2101(b).

*Factual Background*

The Boards' petition alleged Ruebke held herself out as a certified midwife; had been offering prenatal, labor, and delivery services to pregnant women in Kansas; and had been functioning as a registered professional nurse and/or a practitioner of the healing arts.

The petition set out details relating to three pregnancies: the Butterfields, where the petition alleged that twins had died and Ruebke had refused to permit the mother to be taken to the hospital (evidence showed it was Ruebke who had called the ambu-

lance and that one of the twins had died); the Strubles, where it was alleged (although the evidence failed to establish) that Ruebke, who was assisting Kathy Brace, identified herself as a state and nationally certified midwife; and the Ingrams where Ruebke assisted in a delivery directed by a nurse and complications developed, requiring the delivery to be performed in a local hospital.

Based on the allegations of the petition, the trial court issued a temporary restraining order pending a hearing on a temporary injunction.

The hearing on the temporary injunction revealed that Ruebke acts as a lay midwife comprehensively assisting pregnant women with prenatal care, delivery, and post-partum care. She is president of the Kansas Midwives Association and follows its promulgated standards, which include a risk screening assessment based upon family medical history; establishing prenatal care plans, including monthly visitations; examinations and assistance in birth; and post-partum care. She works with supervising physicians who are made aware of her mode of practice and who are available for consultation and perform many of the medical tests incident to pregnancy.

Ruebke does not advertise her services but is available to members of her church, friends, and Christians who hear about her by word of mouth. She delivers babies throughout the state and has supervising physicians in many different regions.

Ruebke does not charge for her services and considers them to be a ministry. Some families have given her money, others goods, and many have given her nothing.

Ruebke testified she had received a copy of and follows the consent decree dated November 15, 1984, from the District Court of Finney County, Kansas, in *State ex rel. Board of Healing Arts v. Hitchcock*, No. 84 C 238, which contained the following orders:

"1. Defendant shall be permitted to engage in the practice of mid-wifery in the State of Kansas, and such practice shall not be considered the practice of healing arts or the practice of medicine and surgery, so long as she utilizes a licensed physician in the vicinity who has agreed to be available in case of complications and to be available for consultation and examination, and so long as she will

provide such physician with her prenatal records of the patient in the event the physician so requests prior to delivery.

"2. The plaintiff Board of Healing Arts shall, prior to December 1, 1984, notify the Kansas Medical Society and Kansas Association of Osteopathic Medicine of the contents of this order, and further shall notify all doctors of medicine and all doctors of osteopathy licensed by it of the contents of this order no later than July 15, 1985, all such notices to be in writing."

Ruebke testified she fully complies with all the requirements of the vital statistics laws of the State of Kansas and registers all births as the state requires.

Dr. Debra L. Messamore, an obstetrician/gynecologist, testified she had reviewed the Kansas Midwives Association standards of care and opined those standards were similar to the assessments incident to her practice as an OB/GYN. Dr. Messamore concluded that in her judgment the prenatal assessments made by Ruebke were obstetrical diagnoses.

Dr. Messamore testified that the prescriptions Ruebke has women obtain from their physicians are used in obstetrics to produce uterine contractions. She further testified the Kansas Midwives Association standard of care relating to post-delivery conditions of the mother and baby involved obstetrical judgments. She reviewed the birth records of the Butterfield birth and testified that obstetrical or medical judgments were reflected. Although admitting that many procedures at issue could be performed by a nurse rather than a physician, she opined,

"Obstetrics includes taking care of the normal process and making sure that it's as normal as possible for the mother and the baby, but also checking to make sure if there's any complications that develop and then treating those complications as they arise, or trying to prevent them if the mother has certain risk factors."

She also stated her opinion that, so defined, obstetrics is a branch of medicine or surgery.

Ginger Breedlove, a Kansas certified advanced registered nurse practitioner and nurse-midwife, testified on behalf of Nursing. She reviewed the Butterfield and Struble records and testified nursing functions were involved. She admitted she could not tell from the records who had engaged in certain practices and that taking notes, giving enemas, and administering oxygen is often done by people

who are not nurses, although education, experience, and minimum competency are required.

After the hearing, the trial court adopted, with two minor exceptions, the proposed findings of fact and conclusions of law submitted by Ruebke's counsel. The court held that provisions of both acts were unconstitutionally vague, Ruebke's midwifery practices did not and were not intended to come within the healing arts act or the nursing act, and her activities fell within exceptions to the two acts even if the acts did apply and were constitutional.

The factual findings, highly summarized, were that Ruebke had not been shown to hold herself out as anything other than a lay midwife; has routinely used and consulted with supervising physicians; was not shown to administer any prescription drugs; was not shown to do any suturing or episiotomies, make cervical or vaginal lacerations, or diagnose blood type; and had engaged only in activities routinely and properly done by people who are not physicians.

*Regulatory history of midwifery*

One of the specific statutory provisions we deal with, K.S.A. 65-2802(a), defines the healing arts as follows:

"The healing arts include any system, treatment, operation, diagnosis, prescription, or practice for the ascertainment, cure, relief, palliation, adjustment, or correction of any human disease, ailment, deformity, or injury, and includes specifically but not by way of limitation the practice of medicine and surgery; the practice of osteopathic medicine and surgery; and the practice of chiropractic."

K.S.A. 65-2869 specifically provides that for the purpose of the healing arts act, the following persons shall be deemed to be engaged in the practice of medicine and surgery:

"(a) Persons who publicly profess to be physicians or surgeons, or publicly profess to assume the duties incident to the practice of medicine or surgery or any of their branches.

"(b) Persons who prescribe, recommend or furnish medicine or drugs, or perform any surgical operation of whatever nature by the use of any surgical instrument, procedure, equipment or mechanical device for the diagnosis, cure or relief of any wounds, fractures, bodily injury, infirmity, disease, physical or mental illness or psychological disorder, of human beings."

With the two applicable healing arts statutes above set forth in mind, it will be helpful in establishing the basis for our decision to relate a brief history of the regulation of midwifery and the healing arts, first generally, then more specifically the particular history in Kansas.

In describing the history of lay midwifery, a law review comment, *Choice in Childbirth: Parents, Lay Midwives, and Statutory Regulation,* 30 St. Louis U.L.J. 985, 989-90 (1986), recounts that midwifery belonged to women from Biblical times through the Middle Ages. However, subsequent to the Middle Ages, women healers were often barred from universities and precluded from obtaining medical training or degrees. With the rise of barber-surgeon guilds, women were banned from using surgical instruments.

When midwives emigrated to America, they occupied positions of great prestige. Some communities licensed midwives and others did not. This continued until the end of the 19th century. In the 19th and 20th centuries, medical practice became more standardized. Economically and socially well-placed doctors pressed for more restrictive licensing laws and for penalties against those who violated them. The law review comment suggests that licensure was a market control device; midwives were depriving new obstetricians of the opportunity for training, and elimination of midwifery would allow the science of obstetrics to grow into a mature medical specialty.

There is a notable absence of anything in the history of Kansas healing arts regulation illustrating any attempt to specifically target midwives. In 1870, the Kansas Legislature adopted its first restriction on the practice of medicine, captioned:

"CONCERNING EMPYRICISM.

"A BILL to protect the people of Kansas from empyricism, and to elevate the standing of the medical profession."

It provided:

"Section 1. That it shall be unlawful for any person within the limit of the state of Kansas, who has not attended two full courses of instruction and graduated in some respectable school of medicine, either of the United States or of some

foreign country, or who cannot produce a certificate of qualification from some state or county medical society, and is not a person of good moral character, to practice medicine in any of its departments for reward or compensation, for any sick person in the state of Kansas." L. 1870, ch. 68, § 1.

This legislation sought to protect the public by seeking to restrict the practice of medicine to those with formal credentials. It should not be viewed as having been intended to apply to midwives, for two reasons. First, by its express language the statute applies only to those who practiced on "sick" people. We later defined "sick" within a statutory regulation of the practice of medicine to mean ailments or infirmities of the body and mind, affected with disease, ill, indisposed, not in health, and disordered. *State v. Douglas*, 124 Kan. 482, 484, 260 Pac. 655 (1927). Second, there can be little doubt that in 1870 Kansas, particularly in rural areas, there were not enough educated physicians available to deliver all of the children born in the state. In fact, until 1910 approximately 50 percent of births in this country were midwife assisted. 30 St. Louis U.L.J. at 988.

In 1901, the 1870 law was repealed and replaced by the immediate precursor to our current healing arts act. G.S. 1901, § 6674 defined the practice of medicine and surgery regulated by the act as follows:

"Any person shall be regarded as practicing medicine and surgery within the meaning of this act who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine, or perform any surgical operation of whatever nature for the cure or relief of any wounds, fracture, or bodily injury, infirmity or disease of another person, or who shall use the words or letters 'Dr.,' 'doctor,' 'M.D.,' or any other title in connection with his name which in any way represents him as engaged in the practice of medicine and surgery. . . . [N]othing in this act shall . . . apply to the administration of domestic medicines, nor to prohibit gratuitous services . . . ."

This statute's focus on "wounds, fracture, or bodily injury, infirmity or disease" is inconsistent with an intent to include the natural delivery of children. In addition, midwifery continued its prevalence at this time, and childbirth had not yet become the dominant province of physicians.

Although obstetricians held themselves out as a medical specialty in the United States as early as 1868, midwives were not seen as engaged in the practice of obstetrics, nor was obstetrics universally viewed as being a branch of medicine. In 1901, North Carolina recognized obstetricians as engaged in the practice of medicine but women midwives, as a separate discipline, were exempted from the licensure act. *State v. Welch*, 129 N.C. 579, 40 S.E. 120 (1901). In a 1911 Kansas case addressing whether chiropractic was the practice of medicine, we noted in passing that in a strict sense obstetrics is not the practice of medicine:

"Medicine is defined as 'the science and art of dealing with the prevention, cure, or alleviation of disease; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician.' (Webster's New Inter. Dict.)." *State v. Johnson*, 84 Kan. 411, 417, 114 Pac. 390 (1911).

Although many states in the early 1900's passed laws relating to midwifery, Kansas has never expressly addressed the legality of the practice. In 1915, in *Yard v. Gibbons*, 95 Kan. 802, 808-09, 149 Pac. 422 (1915), this court implied that a woman with considerable midwife experience was qualified to testify as an expert witness in a malpractice case against an osteopath for allegedly negligently delivering the plaintiff's child.

In the early 1900's, Kansas passed legislation requiring registrations of births, which required the attending physician or midwife to file a certificate of birth with the local registrar. G.S. 1915, § 10162. As part of that act, physicians and midwives were to register their names. G.S. 1915, § 10163. Ruebke argues the purpose of this act was to regulate physicians and midwives and that its repeal in 1951 shows the legislature's intent to no longer regulate lay midwives. This is a misreading of the history of this enactment. Physicians were already regulated when this act was passed, and its purpose was not to regulate any profession, but to implement a system to keep track of vital statistics. When repealed in 1951, it was replaced by a another scheme to collect birth information, where midwives and physicians were still required to file birth certificates, but were not required to register. L. 1951, ch. 355, § 9.

The popularity of midwifery declined significantly during the first third of the 20th Century. By 1930, births attended by non-physicians had declined to 15 percent of all births. 30 St. Louis U.L.J. at 993. This trend continued, and by 1975 the percentage of births attended by midwives had dropped to less than 1 percent. Note, *Regulation of Midwives as Home Birth Attendants*, 30 B.C.L. Rev. 477, 484 (1989).

In 1957, the independent regulation of doctors of medicine and surgeons, osteopaths, and chiropractors was replaced with the current healing arts act, L. 1957, ch. 343. This act adopted the current definition of the practice of medicine that was previously set forth. L. 1957, ch. 343, § 2. Provisions similar to the current ones deemed certain persons to be engaging in the practice of the healing arts or the practice of medicine and surgery. L. 1957, ch. 343, §§ 67, 68, 69.

The 1978 Kansas Legislature created a new classification of nurses, Advanced Registered Nurse Practitioner (ARNP). L. 1978, ch. 240, § 1. One classification of ARNP is certified nurse midwives. Although the regulations permitting the practice of certified nurse midwives might be argued to show additional legislative intent to prohibit the practice of lay midwives, this argument has been rejected elsewhere. See *Leigh v. Board of Registration in Nursing*, 395 Mass. 670, 679-81, 481 N.E.2d 1347 (1985).

In 1978, Kansas Attorney General opinion No. 78-164 suggested that the practice of midwifery is a violation of the healing arts act, although it relied on a questionable interpretation of the Massachusetts law which was specifically disavowed in the *Leigh* case referred to above. Although potentially persuasive, such an opinion is not binding on us. *State v. Scherzer*, 254 Kan. 926, 932, 869 P.2d 729 (1994).

Most probably in response to the 1978 Attorney General opinion, a 1978 legislative interim committee undertook a study of a proposal to recognize and regulate the practice of lay midwifery. However, the committee reached no conclusion, noting that at the time 32 states or territories recognized the practice of midwifery through either legislation or regulations.

In 1984, the Board of Healing Arts brought an action against Lynda J. Hitchcock, a practicing lay midwife in Finney County, which resulted in a consent decree. Ruebke testified she has carefully followed the provisions of the consent decree.

A 1986 review of the laws of every state found that lay midwifery was specifically statutorily permitted, subject to licensing or regulation, in 25 jurisdictions. Twelve states, including Kansas, had no legislation governing or prohibiting lay midwifery directly or by direct implication. Several states recognized both lay and nurse midwives. Some issued new licensing only for nurse midwives, while others regulated and recognized both, often as separate professions, subject to separate standards and restrictions. Note, *Midwifery in America: The Need for Uniform and Modernized State Law*, 20 Suffolk U.L. Rev. 1117, 1125, 1127-29 (1986).

In the 1991 debate on H.B. 2127, which increased the penalties for those practicing medicine or surgery without a license, testimony regarding home births with lay midwives appeared to assume that lay midwives were engaged in the unlicensed practice of the healing arts. However, Richard Gannon, representing the Board of Healing Arts, "noted that midwifery services can be performed within the current law if done so under the supervision of a physician." Minutes of House Committee on Public Health and Welfare, March 18, 1991. Larry Buening, general counsel for the Board of Healing Arts, contended that midwifery is the practice of the healing arts but not a branch thereof.

In voting against H.B. 2127, Representative Stevi Stephens expressed her understanding that it would apply to midwives "who INVADE the practice of the healing arts." House J. 1992, p. 546. In the Senate Committee on Public Health and Welfare, Senator Doug Walker placed on the record his view that the bill "would not adversely impact the practice of midwifery, and any consequence it would have on that effect would be contrary to the intent and understanding of that legislation." Minutes of the Senate Committee on Public Health and Welfare, March 17, 1992. While this legislative history is of interest, it is questionable whether it evidences legislative intent or merely expresses different legislators'

personal viewpoints. See *In re Heller*, 160 Bankr. 655, 659 (D. Kan. 1993).

In April 1993, the Board of Healing Arts released Policy Statement No. 93-02, in which the Board stated it reaffirmed its previous position of August 18, 1984, that

" '[m]idwifery is the practice of medicine and surgery and any practice thereof by individuals not regulated by the Kansas State Board of Nursing or under the supervision of or by order of or referral from a licensed medical or osteopathic doctor constitutes the unlicensed practice of medicine and surgery.' "

In the recent case of *State v. Mountjoy*, 257 Kan. 163, 891 P.2d 376 (1995), we reviewed a criminal prosecution of midwives for practicing the healing arts without a license. The jury had returned verdicts of not guilty, and the State appealed on a question reserved: whether the trial court erred in instructing the jury criminal intent was a required element of the crime of practicing the healing arts without a license. The defendants in *Mountjoy* argued that the healing arts act provided insufficient notice that midwifery is illegal and that it was therefore unconstitutionally vague. We held the practice of the healing arts without a license is a strict liability crime not requiring criminal intent and refused to consider the defendants' constitutionality issue for lack of statutory authority to do so. 257 Kan. at 167.

This historical background brings us to the question of whether the healing arts act is unconstitutionally vague and if Ruebke's midwifery practices, as a matter of law, come within the act's scope. In making this determination, we first consider the parties' diametrically opposed views as to our scope of review on appeal.

*Scope of Review*

The parties' contentions regarding our scope of review present a quandary. First, because portions of the healing arts act and the nursing act were declared unconstitutionally vague, the Boards suggest that as a legal determination, the question of the constitutionality of the acts is entitled to unlimited review with no deference due the trial court. See *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991). Ruebke argues that our consideration of this question can rise no higher than our scope of review of the

trial court's ultimate decision not to permit a temporary injunction, which is subject to review only for an abuse of discretion. See *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 226-27, 689 P.2d 860 (1984); *Wichita Wire, Inc. v. Lennox*, 11 Kan. App. 2d 459, 462, 726 P.2d 287 (1986).

We decline to adopt Ruebke's proposed scope of review. In cases in which a trial court's decision regarding an injunction is based on disputed facts, although we look to whether the trial court abused its discretion, in doing so we will look at whether the factual basis for its decision is supported by sufficient evidence. See *State, ex rel., v. Reed*, 190 Kan. 376, 381, 375 P.2d 588 (1962). Similarly, where we review a mixed law-fact question, we apply the substantial competent evidence test to the factual findings, and determine by unlimited review whether those findings support the legal conclusions. See *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 377-78, 855 P.2d 929 (1993). By analogy, the proper scope of review here is to determine, as a matter of law, with unlimited review, whether the trial court erred in holding the act unconstitutionally vague and, if it did not, whether it abused its discretion in denying the temporary injunction.

The parties have an additional dispute regarding the stringency of our review. Ruebke contends that because the healing arts act makes the unlicensed practice of medicine a strict liability crime, our review should be exacting and the act must be strictly scrutinized. Healing Arts does not dispute that rule, but argues that the rule applies only if it were pursuing a criminal charge. Because Healing Arts is asking for an injunction, it argues we should give the act a liberal construction to achieve the public safety purposes of regulating the unlicensed practice of medicine.

We have held that the constitutionality of a statute, the violation of which is a criminal offense, should be determined by the standards applied to criminal statutes generally, even though considered in the context of a civil suit. *State, ex rel., v. Fairmont Foods Co.*, 196 Kan. 73, 77, 410 P.2d 308 (1966); see *State, ex rel., v. Fleming Co.*, 184 Kan. 674, 339 P.2d 12 (1959). In *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, Syl. ¶ 4, 834 P.2d 368 (1992), we held: "If a statute could subject a person to both crim-

inal and administrative actions, the criminal standard for determining vagueness applies."

Under the standard applied in criminal cases, a statute "is vague and violates due process if it prohibits conduct in terms so vague that a person of common intelligence cannot understand what conduct is prohibited, and it fails to adequately guard against arbitrary and discriminatory enforcement." *State v. Adams*, 254 Kan. 436, Syl. ¶ 1, 866 P.2d 1017 (1994). A statute which requires specific intent is more likely to withstand a vagueness challenge than one, like that here, which imposes strict liability. See *City of Wichita v. Lucero*, 255 Kan. 437, 451, 874 P.2d 1144 (1994).

Even where the rule of strict construction applies, it means only that ordinary words are given their ordinary meaning and that the statute should not be read to include more or less than that readily found within it. See *State v. Finley*, 199 Kan. 615, 617, 433 P.2d 414 (1967). Under strict construction of a criminal statute, any reasonable doubt as to its meaning is to be decided in favor of the accused. *State v. Donlay*, 253 Kan. 132, Syl. ¶ 3, 853 P.2d 680 (1993).

We recognized in *Chambers v. Herrick*, 172 Kan. 510, 516-17, 241 P.2d 748 (1952), that an act which provides for both criminal penalties and license revocation should be interpreted by reference to "sound public policy" when the case did not involve criminal prosecution. Our case arises as an injunction action, and a common-sense determination of fairness is the standard to be utilized. That is, "can an ordinary person exercising common sense understand and comply with the statute? If so, the statute is constitutional." *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, Syl. ¶ 3. In the Indiana case of *Smith v. State ex rel. Medical Licensing Bd.*, 459 N.E.2d 401, 406 n.4 (Ind. App. 1984), a similar approach was adopted where it was held the primary purpose of the Indiana Medical Practice Act was for the protection of the public.

In construing the acts in question, we must consider both their vagueness and the intertwined question of whether they apply to Ruebke's actions as a midwife. This is not a case where the acts are so clear and unambiguous in expressing legislative intent that there is no room for statutory construction. See *State ex rel. Ste-*

phan v. *Board of Seward County Comm'rs*, 254 Kan. 446, 448, 866 P.2d 1024 (1994). However, in construing statutes, "[s]tatutory words are presumed to have been and should be treated as consciously chosen and, with understanding of the ordinary and common meaning, intentionally used with the legislature having meant what it said." *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 168, 815 P.2d 66 (1991). But, if the wording has a commonly understood technical meaning in the context it is employed, it should be construed according to such meaning rather than conflicting nontechnical ordinary meanings. See *Flour Mills of America v. Burrus Mills*, 174 Kan. 709, 716-17, 258 P.2d 341 (1953).

We have held that the interpretation of a statute given by an administrative agency within its area of expertise is entitled to deference, although final construction of a statute always rests with courts. See *In re Tax Appeal of Harbour Brothers Constr. Co.*, 256 Kan. 216, 221, 883 P.2d 1194 (1994). However, under the facts of this case, we owe no deference to the construction expressed by Healing Arts as to the legal question of the scope of its own jurisdiction. See *Kansas Power & Light Co. v. Kansas Corporation Comm'n*, 237 Kan. 394, Syl. ¶ 1, 699 P.2d 53 (1985).

We do, of course, attempt wherever possible to construe a statute as constitutional, as *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 230, 689 P.2d 860 (1984), teaches us:

"Long-standing and well-established rules are that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the Constitution. Moreover, it is the duty of the court to uphold the statute under attack, whenever possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally sound, that should be done."

If legislative intent can be determined, we should construe the statute consistent with that intent. See *State ex rel. Stephan v. Board of Seward County Comm'rs*, 254 Kan. 446, 448, 866 P.2d 1024 (1994). To ascertain and give effect to legislative intent where police power is to be exercised, we must fairly read the entire context of the legislation on the subject, rather than only an isolated section, and consider the object of that legislation and the evils or

mischief sought to be prevented or remedied. *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 452, 436 P.2d 828 (1968). We are mindful that Commissioner Harman, in *Foote*, stated that the "whole purpose and tenor of the healing arts act is the protection of the public against unprofessional, improper, unauthorized, and unqualified practice of the healing arts" and "to secure to the people the services of competent, trustworthy practitioners." 200 Kan. at 453.

Throughout its history, the healing arts regulatory scheme has been unsuccessfully challenged on a variety of constitutional grounds. See *Vakas v. Kansas Bd. of Healing Arts*, 248 Kan. 589, 808 P.2d 1355 (1991); *Kansas State Board of Healing Arts v. Acker*, 228 Kan. 145, 612 P.2d 610 (1980); *Sutherland v. Ferguson*, 194 Kan. 35, 397 P.2d 335 (1964); *State, ex rel., v. Cooper*, 147 Kan. 710, 78 P.2d 884 (1938); *State v. Johnson*, 84 Kan. 411, 114 Pac. 390 (1911); *State v. Wilcox*, 64 Kan. 789, 68 Pac. 634 (1902). However, we have never before considered the precise question of whether the statutory definition of the healing arts is unconstitutionally vague.

*Is the healing arts act unconstitutionally vague and does it apply to midwifery?*

### K.S.A. 65-2802(a)

We have previously set forth the two provisions of the healing arts act under which Ruebke's activities are claimed to be prohibited. The first is K.S.A. 65-2802(a), which limits the healing arts to "ascertainment, cure, relief, palliation, adjustment or correction of any human disease, ailment, deformity or injury."

In holding this provision is not unconstitutionally vague, we rely on the principle that "Kansas has long held a statute will not be declared void for vagueness and uncertainty where it employs words commonly used, previously judicially defined or having a settled meaning in law. *In re Brooks*, 228 Kan. at 544." *State v. Rose*, 234 Kan. 1044, 1046, 677 P.2d 1011 (1984).

The definition of healing arts uses terms that have an ordinary, definite, and ascertainable meaning. The trial court's conclusion

that "disease, ailment, deformity or injury" are not commonly used words with settled meanings cannot be justified.

In *Crees v. California State Board of Medical Examiners,* 213 Cal. App. 2d 195, 208 n.4, 28 Cal. Rptr. 621 (1963), a statute proscribed the unlicensed practice of "any system or mode of treating the sick and afflicted in this State, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other mental or physical condition of any person." The court held there was no merit to the contention that the statute was vague: "A reading of the section suggests that people of common intelligence would have no trouble in understanding what was proscribed." 213 Cal. App. 2d at 215.

The fact that the terms "injury" and "disease" are explicitly defined for the narrow purposes of other statutory enactments does not deprive these terms of common meaning. See K.S.A. 1995 Supp. 44-508(e) (defining injury for workers compensation purposes); K.S.A. 1995 Supp. 40-3103 (defining injury for purpose of the Automobile Injury Reparations Act); K.A.R. 28-1-1 (defining disease).

Our holding that the act is not unconstitutionally vague because the words it uses have ordinary and readily understood meanings does not resolve the dispute before us, which deals with both vagueness and whether Ruebke's activities come within the act's provisions. Although we hold the act not to be unconstitutionally vague, we also hold the definitional provisions do not cover midwifery. In their ordinary usage the terms in K.S.A. 65-2802(a) used to define healing arts clearly and unequivocally focus exclusively on pathologies (*i.e.,* diseases) and abnormal human conditions (*i.e.,* ailments, deformities, or injuries). Pregnancy and childbirth are neither pathologies nor abnormalities.

Our conclusions find support in the decisions of other courts addressing similar questions. For example, under a definition of the practice of medicine similar to our definition of the healing arts, the Court of Criminal Appeals of Texas held:

"It would appear, however, that the Legislature of Texas has not defined the practice of medicine so as to include the act of assisting women in parturition or

childbirth insofar as the practice of medicine without registering a certificate evidencing the right to so practice is made punishable as an offense.

"No reason appears why the Legislature could not establish a line of statutory demarcation separating the work of the midwife from that of practicing medicine.

"We agree that childbirth is a normal function of womanhood, and that proof that the appellant for a consideration agreed to and did attend Julia Valdez at childbirth does not support the allegation of the complaint and information that she treated or offered to treat Julia Valdez for a disease, disorder, deformity or injury or effect a cure thereof." *Banti v. State*, 289 S.W.2d 244, 247 (Tex. Crim. 1956).

The regulatory acts of other states which have been held to include midwifery define healing arts more broadly to deal not only with injuries and abnormalities, but also "conditions" as well. See *Bowland v. Municipal Court*, 18 Cal. 3d 479, 491, 134 Cal. Rptr. 630, 556 P.2d 1081 (1976) ("[A]lthough normal childbirth is not a 'sickness or affliction' within the meaning of section 2141, we conclude, in light of the total statutory scheme governing the practice of the 'healing arts,' that section 2141's prohibition against unlicensed persons treating a 'physical condition' was intended to encompass the practice of midwifery."); *Crees*, 213 Cal. App. 2d at 208 n.4; *Smith v. State ex rel. Medical Licensing Bd.*, 459 N.E.2d 401 (practice of medicine defined to include diagnosis and treatment of any "condition" in Indiana; includes midwifery as dealing with "condition" of pregnancy).

Other jurisdictions have explicitly included birth or midwifery within the healing arts. See Mo. Rev. Stat. § 334.010 (1994) (prohibits unlicensed practice of medicine or surgery in any of its departments or "the practice of midwifery").

The specific terms in the statutory definition of the healing arts are not unconstitutionally vague, but they do not include the normal delivery of children.

Having addressed the issue of whether the specific words of the statutory definition of the healing arts are vague and include midwifery, we must also consider whether the definition as a whole is rendered vague, or broad enough to include midwifery, by the inclusion of the general words "the practice of medicine and surgery" in the definition of the healing arts.

The term "the practice of medicine and surgery," which is included in the statutory definition of the healing arts is not unconstitutionally vague because it has an established legal meaning in this state—a meaning which does not include a midwife's aiding in childbirth.

"Medicine is defined as 'the science and art of dealing with the prevention, cure, or alleviation of disease; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician.' (Webster's New Inter. Dict.) The same authority defines surgery as the 'art or practice of healing by manual operations; that branch of medical science which treats of mechanical or operative measures for healing diseases, deformities or injuries.'" *State v. Johnson,* 84 Kan. at 417.

Similarly, *State ex rel. Mo. State Bd. v. Southworth,* 704 S.W.2d 219, 223 (Mo. 1986), held that the term "practice of medicine" is not unconstitutionally vague.

At least as early as 1915, it is clear that medicine was understood by its nature to be concerned with disease and infirmities. See American Medical Association, Regulation of the Practice of Medicine, p. 78 (1915) ("[A]ny regulation of the practice of medicine should be taken to be directed against any unauthorized person who attempts to treat any physical ailment by whatsoever system he may choose."). Similarly, there is no indication contemporaneous with the enactment of a healing arts regulatory scheme that unlicensed midwifery was being illegalized; nor, from a practical standpoint, could it have been. As we earlier explained, midwifery remained prominent in the earlier part of this century. The services of midwives were needed, and it is abundantly clear that early regulation of Kansas medical practice made no mention of, nor could in any manner be considered to have altered or changed, midwifery.

From its inception in Kansas, the regulation of physicians was directed toward "empyrists," who were quack "healers." No subsequent language in the statutory scheme has clearly shown an intent to expand these enactments to midwives. If the legislature had intended to illegalize such ongoing practices, it could have done so directly. It did not.

Our definition of the practice of medicine was, from its inception, more limited than that of other states. See Regulation of the Practice of Medicine, p. 72 (New York included the diagnosis and treatment of "any human . . . physical condition"; Iowa explicitly included those professing to be obstetricians, as well as physicians, and surgeons, in its act).

*Peckmann v. Thompson*, 745 F. Supp. 1388 (C.D. Ill. 1990), is particularly informative on the question of whether the "practice of medicine" in its ordinary sense could be applied to midwifery. The Illinois court found that it could not, stating:

"As noted, paragraph 4400-50 prohibits the 'practice of medicine in all of its branches.' Because the Act fails to define this term, and because its common understanding generally does not encompass assisting the normal delivery of a healthy child, the plaintiffs reasonably may have concluded that their conduct was not proscribed by that portion of the Act. Similarly, paragraph 4400-49 prohibits, among other things, the unlicensed treatment of any 'ailments, or supposed ailments.' Again, because that term is nowhere defined, and because its common understanding generally does not describe the condition of a pregnant woman without complications, the plaintiffs reasonably may have concluded that their conduct was not proscribed by that portion of the Act." 745 F. Supp. at 1393.

Healing Arts argues that the "practice of medicine" includes the practice of obstetrics. It reasons, in turn, that obstetrics includes the practices traditionally performed by midwives. From this, it concludes midwifery is the practice of medicine.

However, equating midwifery with obstetrics, and thus with the practice of medicine, ignores the historical reality, discussed above, that midwives and obstetricians coexisted for many years quite separately. From the time of our statehood, the relationship between obstetricians and midwives changed from that of harmonious coexistence, cooperation, and collaboration, to open market competition and hostility. See 20 Suffolk U.L. Rev. at 1119-20.

We will not engage in speculation or osmotic reasoning that while obstetrics and midwifery were not in the technical or narrow sense the "practice of medicine" 80 years ago, they have now subliminally so become. Such questionable logic should not be the underpinning of the prohibition of midwifery when, if the Kansas Legislature had wanted to specifically equate midwifery to the

practice of medicine, it could have done so as the Missouri Legislature did. See Mo. Rev. Stat. § 334.010 (1994).

To even the most casual observer of the history of assistance to childbirth, it is clear that over the course of this century the medical profession has extended its reach so deeply into area of birthing as to almost completely occupy the field. The introduction of medical advances to the childbirth process drew women to physicians to assist during the birth of their children. Yet, this widespread preference for physicians as birth attendants hardly mandates the conclusion that only physicians may assist with births.

Neither logic nor experience suggests this conclusion. At the time the legislature chose to commence to regulate practitioners of medicine and surgery, the delivery of children, although sometimes assisted by physicians, was not the practice of medicine or surgery. We noted in *State v. Johnson,* 84 Kan. 411, 114 Pac. 390 (1911), that as a technical matter obstetrics itself was not part of the art and science of medicine, even though medicine might from time to time be applied in the course of obstetrical practice. Where the ordinary meaning of words may have changed since the enactment of a statute, they must be understood in the sense they were intended at the time the statute was enacted. *United Parcel Service, Inc. v. Armold,* 218 Kan. 102, 107, 542 P.2d 694 (1975). The fact that a person with medical training provides services in competition with someone with no medical degree does not transform the latter's practices into the practice of medicine.

This analysis is similar to the approach taken by Massachusetts. In *Commonwealth v. Porn,* 196 Mass. 326, 82 N.E. 31 (1907), the court considered whether a midwife who also used prescriptions and, in cases of emergency when no physician was available, obstetrical instruments was engaged in the practice of medicine. The Massachusetts court had held in an earlier case that whether a midwife practiced medicine in a given case depended on the facts of that case: "Whether upon such evidence it would appear that the ministrations of a midwife are those of a physician, or rather of an attendant nurse and helper, would ordinarily be a question of fact or, if the facts were not in dispute, a question of law." *Commonwealth v. Porn,* 195 Mass. 443, 445-46, 81 N.E.305

(1907). Massachusetts found, as a matter of law, that in the second case the defendant had practiced medicine. Thus, Massachusetts does not consider the practice of midwifery itself to be the practice of medicine under definitions similar to our own, but it does find that a midwife practices medicine when she "practices midwifery *and* uses obstetrical instruments when a physician is unavailable and who prescribes drugs." *Leigh v. Board of Registration in Nursing*, 395 Mass. 670, 680 n.12, 481 N.E.2d 1347 (1985). In *Leigh* the use of a fetal heart monitor, a blood-pressure cuff, and oxygen was insufficient to cause a midwife to be engaged in medicine. 395 Mass. at 685.

In addition, the rule of construction *ejusdem generis* suggests that the inclusion of specific words dealing solely with pathological conditions shows the intent of the legislature to deal only with such "healing" practices in the general terms "medicine" and "surgery":

" 'The rule *ejusdem generis* is a well known maxim of construction to aid in ascertaining the meaning of a statute or other written instrument which is ambiguous. Under the maxim, where enumeration of specific things is followed by a more general word or phrase, such general word or phrase is held to refer to things of the same kind, or things that fall within the classification of the specific terms.' " *Bank of Kansas v. Hutchinson Health Services, Inc.*, 246 Kan. 83, 89, 785 P.2d 1349 (1990) (quoting *John Deere Co. v. Butler County Implement, Inc.*, 232 Kan. 273, 277, 655 P.2d 124 [1982]).

Healing Arts argues that discussing Ruebke's activities as "midwifery" is irrelevant and useless because the term is so indefinite that it lacks any meaning. Healing Arts asks us to review each action Ruebke takes—every decision she makes and everything she does—and determine if any of them standing alone are the practice of the healing arts, *e.g.*, severing the umbilical cord.

The term "practice of midwifery" is not meaninglessly indefinite. Without explicit definition, it has been held sufficiently definite to withstand a challenge for vagueness. See *State ex rel. Mo. State Bd. v. Southworth*, 704 S.W.2d at 223-24, where it was stated:

"Likewise the words 'practice of midwifery' are words of common usage, understandable by persons of normal intelligence. Appellant herself testified that the term 'midwife' means 'a woman assisting a woman at childbirth.' Her definition is almost identical to that of Black's Law Dictionary 895 (5th ed. 1979), wherein midwifery is defined as '[a] woman who assists at childbirth; *an accoucheuse.*'

Similarly, the relevant definition of 'midwifery,' found in Webster's Third New International Dictionary 1432 (1981), is 'the art or act of assisting at childbirth; *also*: OBSTETRICS.' . . . Suffice it to say that 'practice of midwifery' is commonly understood to include the exercise of, as a profession or occupation, the art or act of assisting at childbirth.

". . . Persons of ordinary intelligence need not guess at the statute's meaning and the statute affords sufficient guidance to those who must apply it."

Ruebke argues, and the trial court so ruled, that even if particular acts constitute the practice of the healing arts as defined by the act, those practices are not prohibited if the legislature never intended the act to apply to midwives. Ruebke seeks support for this argument in *Acupuncture Society of Kansas v. Kansas State Bd. of Healing Arts*, 226 Kan. 639, 645, 602 P.2d 1311 (1979), in which this court considered whether acupuncture was surgery, such that a chiropractor would be prohibited from practicing it. We noted that while the practices used in acupuncture fit within a broad definition of surgery, acupuncture had its own separate and unique history. Because acupuncture was historically and commonly not considered surgery, even though it technically may have been under some definitions, we found the legislature had no intent to include it as such. Whatever the dictionary definition of "surgery," acupuncture was outside of the contemporaneous understanding of surgery by the ordinary layman.

Similar reasoning applies to midwifery: Even if the traditional and time-honored techniques employed by midwives fit within a technical definition of the practice of medicine or surgery, if the legislature did not intend to regulate the historically separate practice of midwifery, then it should not be considered the practice of medicine or surgery for the purposes of the healing arts act.

**K.S.A. 65-2869**

Healing Arts contends that even if Ruebke's activities are not prohibited under the definitional provisions of K.S.A. 65-2802(a), she nevertheless should be deemed to be engaged in the practice of medicine and surgery because she is one of the people who "publicly profess to assume the duties incident to the practice of

medicine or surgery or any of their branches" pursuant to K.S.A. 65-2869.

Before we consider this expansionist view of the legislative language, we must first address the trial court's implicit ruling that K.S.A. 65-2869 need not be considered because it is unconstitutionally vague. Although the Illinois federal district court in *Peckmann*, 745 F. Supp. 1388, has suggested that the wording "practice of medicine in all of its branches" is unconstitutionally vague when applied to midwifery, we specifically reject such an approach to our healing arts act and the conclusions it would require.

As articulated in *Flax v. Kansas Turnpike Authority*, 226 Kan. 1, 9, 596 P.2d 446 (1979), this court recognizes a strong preference, where consistent with legislative intent, for interpreting certain subjects as outside a statute's scope rather than declaring the statute unconstitutional:

"In *State v. Smiley*, 65 Kan. 240, 69 Pac. 199 (1902), *aff'd* 196 U.S. 447, 49 L. Ed. 546, 25 S. Ct. 289 (1905), this court recognized the proposition that general language, valid upon its face, may be construed to exclude certain subjects or classes of things in order that the entire statute will not be held unconstitutional . . . ."

Following this reasoning, we hold that K.S.A. 65-2869 as we construe it herein is not unconstitutionally vague.

Healing Arts argues that the prohibition on chiropractors practicing obstetrics in K.S.A. 65-2802(a) shows clear legislative intent to include obstetrics as a branch of medicine or surgery. According to this argument, Ruebke, publicly professes to assume duties incident to obstetrics, and therefore her midwife services are prohibited. We find no support in the language of the statute for this tortured argument that the prohibition of chiropractors from obstetrics practice is intended by the legislature to bring lay midwifery within the healing arts act. The provision cited by Healing Arts means no more than it says—that chiropractors may not engage in obstetrics.

Nevertheless, we must still consider the question of whether Ruebke is deemed to be engaged in the healing arts because her services are "incident to" the practice of medicine or surgery. A statute must be interpreted in the context in which it was enacted

and in light of the legislature's intent at that time. Constructions placed on statutes by the court must be reasonable and should not lead to absurd results.

As we have previously stated, the legislature has at no time made it plain that midwifery was to be considered part of the healing arts. If we were to ignore the historical reality that the legislature never manifested any intent to prohibit midwifery and adopt Healing Art's argument, we would be giving K.S.A. 65-2869 a construction unintended by the legislature and absurd in application.

An activity is not "incident to" the practice of medicine merely because it is engaged in by some members of the medical profession. Drafting medical research papers may be an activity to which certain licensed physicians devote considerable time, but it is not an activity which only licensed practitioners can claim to do without fear of criminal prosecution because it is "incident to" the practice of medicine. Physicians may testify in court as experts in biological processes or pharmacology. Nevertheless, an unlicensed expert is not committing a crime by publicly professing availability to present such testimony because it might be "incident to" the practice of medicine in some general sense.

Applying the rules of construction outlined earlier in this opinion, one thing is "incident to" another only if it "naturally and inseparably, depends upon, appertains to, or follows another that is more worthy." Black's Law Dictionary 762 (6th ed. 1990). The practice of midwifery is separate and distinct from the practice of medicine. The practice of midwifery is not incident to the practice of medicine or surgery so that it becomes a part of the healing arts by the application of K.S.A. 65-2869.

Although we hold the practice of midwifery is not itself the practice of the healing arts under our statutory scheme, our conclusions should not be interpreted to mean that a midwife may engage in any activity whatsoever with regard to a pregnant woman merely by virtue of her pregnancy. In *Banti* v. *State*, 289 S.W.2d 244, 247-48 (Tex Crim. 1956), the Texas court explained the limited scope of its similar holding:

"We should not be understood as holding that the statute could not be violated so long as the patient was a pregnant woman. Of course pregnancy would not

prevent a woman from having a disease, disorder, deformity or injury for which she would require the services of a practitioner of medicine."

Therefore, the question of whether Ruebke was engaged in the practice of the healing arts, under the facts of this case developed during the evidentiary hearing, is not resolved only by our conclusion that the practice of midwifery is not included in K.S.A. 65-2802(a) and K.S.A. 65-2869. However, we need not decide the precise boundaries of what a midwife may do without engaging in the practice of the healing arts because, in the case before us, Ruebke was found to have worked under the supervision of physicians who were familiar with her practices and authorized her actions. Any of Ruebke's actions that were established at trial, which might otherwise have been the practice of the healing arts, were exempt from the healing arts act because she had worked under the supervision of such physicians.

K.S.A. 65-2872 exempts certain activities from the licensure requirements of the healing arts act. In relevant part it provides:

"The practice of the healing arts shall not be construed to include the following persons:

. . . . .

"(g) Persons whose professional services are performed under the supervision or by order of or referral from a practitioner who is licensed under this act."

The trial court found as a factual matter:

"Throughout her years of practice as a midwife, Michelle Ruebke has routinely utilized a licensed physician in the vicinity of the family who has agreed to be available in the case of complications and to be available for consultation and examination, and has routinely provided such physician with her prenatal records of the patient when the physician has so requested prior to delivery.

. . . .

"Michelle Ruebke has continuing contact with the supervising physician throughout the prenatal care and delivery of the child.

"Michelle Ruebke has worked with most of her supervising physicians for some period of time now, but she initially established her relationship with them by talking with the physician in person, answering questions about her practice, reviewing the forms that she requests them to complete, and asking about their preferences, including such details as whether the physician wants to be notified of the time a woman goes into labor, when a baby is delivered, at what point he would like to be called, and whether he is available for consultation at any point

during the pregnancy. Michelle Ruebke's goal is to ask the physicians for input so that she can work with them in the manner the physician desires.

"Throughout her practice, the supervising physicians with whom Michelle Ruebke has worked have seen the mother before delivery, have agreed to work with Michelle Ruebke, have agreed to be available for consultation, have agreed to be available for referral in the event emergency care or transfer to a hospital is necessary, have been familiar with Michelle Ruebke's practice and have provided certain services to her regarding the mother under their cooperative care."

The question of whether Ruebke's activities are exempted from the healing arts act is a legal question over which our review is unlimited. See *Garrision v. State Farm Mut. Auto Ins. Co.*, 258 Kan. 547, 550, 907 P.2d 891 (1995). This court discussed K.S.A. 65-2872(g) briefly in *State, ex rel., v. Doolin & Shaw*, 209 Kan. 244, 262, 497 P.2d 138 (1972):

"The use of technicians to assist medical doctors is a long-standing practice. Nurses, nurses' aides, physical therapists, X-ray technicians, laboratory technicians, prosthesis technicians, and fitters of artificial eyes are examples of the use of ancillary technicians. The right to referral by physicians is recognized by K.S.A. 65-2872 (g)."

It should be clear that the level of supervision required of these ancillary technicians is minimal and substantially less than direct oversight and control. In light of the uncontested factual findings of the trial court, which were supported by competent evidence in the record, we agree with the trial court that the exception to the healing arts act recognized by K.S.A. 65-2872(g) applies to any of Ruebke's midwifery activities which might otherwise be considered the practice of the healing arts under K.S.A. 65-2802(a) and K.S.A. 65-2869.

We hold only that midwifery itself is not the practice of the healing arts and that, under the facts of this case, those activities beyond midwifery in which Ruebke might have engaged were excepted from the healing arts act by virtue of the supervision provided by a licensed physician.

*Is the Nursing Act Unconstitutionally Vague?*

The trial court also found that the definition of the practice of nursing in K.S.A. 65-1113(d) is unconstitutionally vague. Again, if the nursing act does not plainly apply to midwifery, our preference

is to hold it does not cover such activities rather than declare it unconstitutionally vague, if such can be done within the intent of the legislature. Consistent with our analysis of the healing arts act, we reject the trial court's conclusion that the nursing act is unconstitutionally vague and uphold the validity of the act.

As we have held, the legislature has never specifically acted with the intent to restrict or regulate the traditional practice of lay midwifery. Nevertheless, Nursing argues such birth assistants must be licensed nurses before they may render aid to pregnant women. In oral argument, Nursing conceded much of its argument would be muted were we to hold, as we do above, that the practice of midwifery is not the practice of the healing arts and thus not part of a medical regimen.

The practice of nursing is defined in K.S.A. 65-1113 as follows:

"(d) *Practice of nursing.* (1) The practice of professional nursing as performed by a registered professional nurse for compensation or gratuitously; except as permitted by K.S.A. 65-1124 and amendments thereto, means the process in which substantial specialized knowledge derived from the biological, physical, and behavioral sciences is applied to: the care, diagnosis, treatment, counsel and health teaching of persons who are experiencing changes in the normal health processes or who require assistance in the maintenance of health or the prevention or management of illness, injury or infirmity; administration, supervision or teaching of the process as defined in this section; and the execution of the medical regimen as prescribed by a person licensed to practice medicine and surgery or a person licensed to practice dentistry. (2) The practice of nursing as a licensed practical nurse means the performance for compensation or gratuitously, except as permitted by K.S.A. 65-1124 and any amendments thereto, of tasks and responsibilities defined in part (1) of this subsection (d) which tasks and responsibilities are based on acceptable educational preparation within the framework of supportive and restorative care under the direction of a registered professional nurse, a person licensed to practice medicine and surgery or a person licensed to practice dentistry."

The practice of nursing is defined by reference to the practitioner's substantial specialized knowledge in areas of the biological, physical, and behavioral sciences and educational preparation within the field of the healing arts. Ruebke claims no specialized scientific knowledge, but rather readily admits she has no formal education beyond high school. Her assistance is valued not because it is the application of a firm and rarified grasp of scientific theory,

but because, like generations of midwives before, she has practical experience assisting in childbirth.

Moreover, "nursing" deals with "persons who are experiencing changes in the normal health processes." As these words are commonly understood, pregnancy and childbirth do not constitute changes in the normal health process, but the continuation of it.

A nurse is commonly understood, as reflected in our statutory definition of nursing, to be a person who works in the same area as and under the supervision of a physician or other practitioner of the healing arts. As we have held, the practice of lay midwifery has, throughout the history of the regulation of nursing, been separate and distinct from the practice of the healing arts, to which nursing is so closely joined. While we have no doubt of the legislature's power to place lay midwifery under the authority of the State Board of Nursing, the legislature has not done so.

We find no legislative intent manifested in the language of the nursing act clearly illustrating the purpose of including the historically separate practice of midwifery within the practice of nursing. See generally *Acupuncture Society of Kansas v. Kansas State Bd. of Healing Arts*, 226 Kan. 639, 645-46, 602 P.2d 1311 (1979) (even if acupuncture might fit some technical definitions of surgery, because it is historically separate with a unique history, it is not surgery within the healing arts act). Assistance in childbirth rendered by one whose practical experience with birthing provides comfort to the mother is not nursing under the nursing act, such that licensure is required.

Although the parties raise questions about the applicability of various other exceptions to both the nursing act and the healing arts act, the law governing temporary injunctions, and other issues, in light of our holdings above we need not address these questions in the present action. We affirm the trial court's order denying the Boards a temporary injunction, although we reverse its finding that the acts at issue violate the constitution.

Affirmed in part and reversed in part.