MARY ELLEN ALBINI ET AL. *v.* CONNECTICUT MEDICAL EXAMINING BOARD
(AC 33462)

Lavine, Bear and Schaller, Js.

Argued January 11—officially released July 23, 2013

*Diane Polan*, with whom, on the brief, was *S. Max Simmons*, for the appellants (plaintiffs).

*Henry A. Salton*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (defendant).

SCHALLER, J. The plaintiffs, Mary Ellen Albini and Joan Mershon, appeal from the judgment of the trial court dismissing their administrative appeal from the decision of the defendant, the Connecticut Medical Examining Board (board). On appeal, the plaintiffs claim that the trial court erred in dismissing their appeal because the board's order (1) exceeded the scope of its statutory authority, (2) unlawfully restricted the common-law practice of midwifery and (3) construed General Statutes § 20-9 in an unconstitutionally vague and overbroad manner. The plaintiffs also claim that the trial court, in its opinion, erroneously referred to and relied upon repealed statutes. The board filed a cross appeal asserting that (1) the trial court lacked jurisdiction to review the plaintiffs' claims, (2) the trial court erred in determining that the order was overbroad and (3) alternatively, if the trial court correctly found that the board's order was overbroad, this court should remand the matter to the board for further proceedings. We reverse the judgment of the trial court with respect to part one of the board's order and affirm the judgment in all other respects.

The following facts and procedural history, as found by the board and set forth by the trial court, are undisputed. The plaintiffs are independent midwives who have not been issued licenses to practice medicine by the state of Connecticut.[1] The plaintiffs provided prenatal care to C.B., an expectant mother and, in the course of care, they obtained a medical history, and provided

---

[1] The plaintiffs are not nurse midwives as defined by General Statutes § 20-86a.

periodic physical examinations and advice about nutrition, exercise and having a home birth. C.B.'s physician advised her against a home delivery due to the baby's positioning and estimated fetal weight, but the plaintiffs advised C.B. that she could have a home delivery despite her physician's advice to the contrary.

C.B. went into labor in the early morning of May 26, 2000. The plaintiffs went to C.B.'s home to assist with the labor and delivery. The plaintiffs advised C.B. to go to the hospital because the baby had an elevated fetal heart rate. While en route to the hospital with her husband, C.B. began to deliver her baby. At this time, C.B.'s husband drove his car into a parking lot. The plaintiffs were following in a separate vehicle. Emergency medical personnel responded to the scene, and Albini informed them that the baby, E.B., had been born. The emergency medical personnel requested permission to examine E.B., and the plaintiffs refused access to the child. The emergency medical personnel also requested to take C.B. and E.B. to the hospital for medical evaluation, but the plaintiffs refused this request. The plaintiffs and emergency medical personnel remained with C.B. in the car for approximately thirty to forty minutes waiting for the placenta to be delivered. When there was no spontaneous delivery, the emergency medical personnel transported C.B. to the hospital. Prior to leaving with C.B., emergency medical personnel again requested permission to transport E.B. to the hospital for medical evaluation. C.B. and her husband relied on the plaintiffs' advice that E.B. was healthy when they refused additional medical evaluation for the child.

Approximately two hours after his birth, E.B. was taken to C.B.'s hospital room, and, while visiting, he developed difficulty breathing and appeared cyanotic. Shortly thereafter, E.B. was taken to the hospital's emergency department where he was admitted in respiratory distress. After the emergency department

assessed and treated E.B., he was transferred to the neonatal intensive care unit. E.B. was discharged from the hospital several days later with a diagnosis of pneumonitis.

The department of public health presented the board with separate charges seeking a cease and desist order against each of the plaintiffs on the ground that they had engaged in the unauthorized practice of medicine in violation of § 20-9; the charges against the two were subsequently consolidated. Hearings before a panel of the board were held between 2003 and 2005. The panel issued its proposed decision, which then was referred to the entire board. The plaintiffs submitted a brief and posthearing brief to the panel but chose not to file exceptions to the proposed decision or to appear before the full board at its meeting on March 18, 2008, to present oral argument challenging the proposed decision. On March 18, 2008, the board approved the proposed decision unanimously and it thereby became the final decision.

The board concluded that the plaintiffs violated § 20-9 (a), which provides in relevant part: "No person shall, for compensation, gain or reward, received or expected, diagnose, treat, operate for or prescribe for any injury, deformity, ailment or disease, actual or imaginary, of another person . . . until he has obtained such a license [to practice medicine]." The board issued an order that the plaintiffs immediately "cease and desist from practicing medicine unless and until [they] are properly licensed" (original order).

The plaintiffs timely appealed the original order on May 2, 2008, and moved the court for a stay of the final decision. On September 22, 2008, the court, after hearing, denied the plaintiffs' motion for a stay. The court observed that the original order was ambiguous, as it directed the plaintiffs not to practice medicine

although they denied that they were practicing medicine. The board subsequently moved for a voluntary remand in order to clarify its final decision, which the court granted.

Thereafter, on July 20, 2010, the board issued a revised final decision after amending the original order in an executive session (revised order). The revised order stated, in relevant part: "Pursuant to the authority vested in it by section 19a-11 of the Connecticut General Statutes, the board orders that the [plaintiffs] immediately cease and desist from practicing medicine as defined in section 20-9 (a) of the Connecticut General Statutes (i.e. diagnose, treat, operate for or prescribe for any injury, deformity, ailment or disease, actual or imaginary, of another person) including but not limited to the following actions unless and until [plaintiffs] are properly licensed." The revised order thereafter includes three numbered paragraphs. Part one provides as follows: "[Plaintiffs] shall cease and desist from diagnosing a person's condition including but not limited to assessing persons to determine the presence or absence of conditions that may require immediate or future medical care or the course of potential medical care."[2]

The plaintiffs pursued their appeal to the trial court with respect to the revised order, asserting that the

___

[2] The plaintiffs do not challenge the validity of the board's other modifications to its original order, namely, parts two and three of the board's revised order, which provided as follows: "(2) [Plaintiffs] shall cease and desist from advising persons based upon their assessment of a person's condition (i) whether the assessment or diagnosis of health care providers who have seen the person are correct in their diagnosis or assessment that they have provided the person and (ii) whether to comply with or depart from directions or advice of licensed medical providers who have diagnosed and advised the person.

"(3) [Plaintiffs] shall cease and desist from advising persons based upon their assessments of a person's condition whether or not the assessment or intervention of licensed health providers is necessary."

board lacked jurisdiction to sanction them because their activities as independent midwives did not constitute the unauthorized practice of medicine in violation of § 20-9 and that § 20-9, as interpreted by the board, was unconstitutionally vague. The court, in its memorandum of decision dated April 5, 2011, stated that part one had "too broad a sweep to the extent that it forbids determinations associated with normal pregnancy, well-baby care, and the decision to refer a more complicated matter to a physician. . . . [This court's] opinion in general permits such activities by midwives." Nevertheless, the court concluded that part one was appropriate when read in context of the following facts: the plaintiffs and C.B. discussed disregarding C.B.'s physician's advice; the plaintiffs refused to give emergency medical personnel access to C.B. and E.B; the plaintiffs advised C.B. to stay in her vehicle and wait for spontaneous placenta delivery; and the plaintiffs advised C.B. that E.B. was healthy and need not be evaluated at the hospital. The court further concluded that the board's findings of fact supported parts two and three of the revised order; see footnote 2 of this opinion; and it dismissed the plaintiffs' administrative appeal.

The plaintiffs filed a motion to reconsider and/or reargue, asserting that after the court concluded that midwifery in the context of normal pregnancies did not constitute the practice of medicine, the court should have either remanded the case to the board with instructions to modify its order or sustained the appeal and modified the board's decision in accordance with General Statutes § 4-138 (j) and (k). The court, in its April 28, 2011 ruling on the plaintiffs' motion, noted that the board's revised order should not be read beyond the factual context of this case. The court concluded that, in the factual context of this case, the plaintiffs failed to meet their burden of showing that part one of the revised order was not sustainable on this specific

record. The court granted the motion to reconsider only to the extent that the rescript of the prior decision was withdrawn and reissued as follows: "The appeal is fully dismissed as to [parts two and three of the revised order] of the board; it is dismissed as to [part one] as addressed in this opinion." The plaintiffs' appeal, and the board's cross appeal followed. Additional facts are set forth as necessary.

I

We first address the board's contention, raised in its cross appeal, that the trial court lacked jurisdiction to review the plaintiffs' claims. Specifically, the board argues that the plaintiffs waived any objections or challenges regarding the final decision when they elected not to present oral argument to the full board with regard to the proposed decision in accordance with General Statutes § 4-179. According to the board, the plaintiffs failed to fully exhaust their administrative remedies thereby depriving the court of subject matter jurisdiction. We conclude that the board's arguments lack merit.

The court concluded that the plaintiffs were not barred from raising their claims on appeal. Relying on *Dragan* v. *Connecticut Medical Examining Board*, 223 Conn. 618, 613 A.2d 739 (1992), the court reasoned that although the plaintiffs had elected not to present oral argument before the board, "[the board's] decisions [were] questioned in this appeal for the *same reasons* brought to the panel's attention both by the plaintiffs' evidentiary proof and legal argument." (Emphasis added.) We agree with the trial court.

We begin by setting forth the legal principles that will guide our analysis. "We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *Peters* v. *Dept. of*

*Social Services,* 273 Conn. 434, 441, 870 A.2d 448 (2005). "[Our Supreme Court has] made it clear that [it] will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during trial." (Internal quotation marks omitted.) *Dragan* v. *Connecticut Medical Examining Board,* supra, 223 Conn. 632. "A party to an administrative proceeding cannot be allowed to participate fully at hearings and then, on appeal, raise claims that were not asserted before the [board]." (Internal quotation marks omitted.) *Evans* v. *Plan & Zoning Commission,* 73 Conn. App. 647, 651, 808 A.2d 1151 (2002).

The relevant language of § 4-179 (a) provides that when the majority of the agency members rendering the final decision have not heard the matter or read the record, the decision "shall not be rendered until a proposed final decision is served upon the parties, and an opportunity is afforded to each party adversely affected to file exceptions and present briefs and oral argument . . . ." We first observe that the plain language of § 4-179 (a) does not require the plaintiffs to present oral argument but, instead, states that under certain circumstances an opportunity to present exceptions or argument must be provided.

Our courts have remarked that this section, and its predecessors, provide procedural safeguards to protect the plaintiffs' due process rights and ensures that the board is sufficiently acquainted with the issues so it may render an informed judgment. See *Pet* v. *Dept. of Health Services,* 228 Conn. 651, 673, 638 A.2d 6 (1994); *Towbin* v. *Board of Examiners of Psychologists,* 71 Conn. App. 153, 173–74, 801 A.2d 851, cert. denied, 262 Conn. 908, 810 A.2d 277 (2002). The board has not provided us with any authority supporting its contention that the plaintiffs' failure to present oral argument pursuant to § 4-179 subsequently bars them from

challenging the decision on appeal or that this statute serves that particular purpose.

Under the circumstances of this case, the plaintiffs' failure to file exceptions or present oral argument pursuant to § 4-179 was not tantamount to failing to challenge the proposed decision. A thorough review of the record reveals that the plaintiffs consistently challenged the board's jurisdiction and construction of § 20-9. Specifically, the plaintiffs argued during the hearings and in their posthearing brief that the board lacked jurisdiction to sanction or examine their actions because they were not engaged in the practice of medicine as defined by § 20-9. This case is akin to *Burinskas* v. *Dept. of Social Services*, 240 Conn. 141, 691 A.2d 586 (1997). In *Burinskas*, the defendants argued that because the plaintiffs did not challenge the standard applied by the hearing officer at the fair hearing, they should be barred from raising the argument on appeal. Id., 153 n.15. Our Supreme Court disagreed, concluding that the plaintiffs were not barred from raising the claim because they could not have clearly articulated their challenge until the hearing officer rendered his final report relying on the improper standard. Id. Similarly, in the present case, the specific challenges that the plaintiffs raise regarding part one of the order could not have been specifically articulated until the board rendered its revised final decision on remand. Thus, this is not a case in which the plaintiffs are, for the first time on appeal, raising claims that were not asserted before the board. Cf. *Dragan* v. *Connecticut Medical Examining Board*, supra, 223 Conn. 632 (plaintiff did not assert during license revocation proceedings that right to cross-examine witness was violated). Accordingly, we conclude that the trial court properly determined that the plaintiffs were not barred from raising their claims on appeal

and further conclude that it had jurisdiction over the matter.[3]

## II

The plaintiffs first assert that part one of the board's revised order, as written, unlawfully purports to expand the board's jurisdiction beyond statutory provisions. The board ordered the plaintiffs to cease and desist from the practice of medicine, as defined by § 20-9 (a), and stated that such practice included but was not limited to, "diagnosing a person's condition [by] assessing persons to determine the presence or absence of conditions that may require . . . medical care." The plaintiffs specifically argue that the board's use of the word "condition" in part one was an invalid interpretation of § 20-9, which impermissibly authorized the board to regulate the conduct of independent midwives in their course of practice as it pertains to normal pregnancies in excess of the board's statutory authority.[4] We agree with the plaintiffs.

As a preliminary matter, we set forth the standard of review and legal principles that will guide our analysis. "[J]udicial review of an administrative agency's action is governed by the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and the scope of that review is limited. . . . [R]eview of an administrative agency decision [usually] requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Citation omitted; internal quotation marks omitted.) *Dickman* v.

[3] To the extent the board asserts that this court is also without jurisdiction, we disagree and for the aforementioned reasons conclude that this court has jurisdiction to review the merits of the plaintiffs' claims.

[4] It is undisputed that the board is empowered to seek a cease a desist order against those individuals deemed to be engaged in the unauthorized practice of medicine. See General Statutes §§ 20-9, 19a-11 and 19a-14.

*Office of State Ethics, Citizen's Ethics Advisory Board,*
140 Conn. App. 754, 766, 60 A.3d 297 (2013).

Because the plaintiffs' claim presents a matter of
statutory construction, which is a question of law, we
will apply a broader standard of review. "Cases that
present pure questions of law . . . traditionally invoke
a broader standard of review than ordinarily is involved
in deciding whether, in light of the evidence, the agency
has acted unreasonably, arbitrarily, illegally or in abuse
of its discretion. . . . We have determined, therefore,
that we will defer to an agency's interpretation of a
statutory term only when that interpretation of the stat-
ute previously has been subjected to judicial scrutiny
or to a governmental agency's time-tested interpretation
and is reasonable." (Internal quotation marks omitted.)
Id., 767. The board does not contend that it has applied
a time-tested interpretation, and we observe that this
issue has not yet been addressed by the board or our
courts. See *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn.
656, 663, 916 A.2d 803 (2007). "[W]e [therefore] afford
no special deference to the conclusion of the board.
. . . Instead, we exercise the plenary review we other-
wise apply to such questions of law." (Citation omitted.)
*Pizzuto* v. *Commissioner of Mental Retardation*, 283
Conn. 257, 264, 927 A.2d 811 (2007); see also *State
Medical Society* v. *Connecticut Board of Examiners
in Podiatry*, 208 Conn. 709, 719, 546 A.2d 830 (1988).

Our analysis of whether the board exceeded its
authority or acted without jurisdiction focuses on the
relevant statute, § 20-9. "Administrative agencies . . .
are tribunals of limited jurisdiction and their jurisdic-
tion is dependent entirely upon . . . the statutes vest-
ing them with power and they cannot confer jurisdiction
upon themselves. . . . We have recognized that [i]t is
clear that an administrative body must act strictly
within its statutory authority, within constitutional limi-
tations and in a lawful manner. . . . It cannot modify,

abridge or otherwise change the statutory provisions . . . under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Celentano* v. *Rocque*, 282 Conn. 645, 654, 923 A.2d 709 (2007).

"Our Supreme Court previously has instructed that in construing statutes, [the] fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Livingston* v. *Dept. of Consumer Protection*, 120 Conn. App. 92, 98, 991 A.2d 570 (2010). "[W]ords and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly. . . . If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Citation omitted; internal quotation marks omitted.) *Ugrin* v. *Cheshire*, 307 Conn. 364, 380, 54 A.3d 532 (2012).

We agree with the plaintiffs that the board exceeded its statutory authority when it interpreted § 20-9 to include the diagnosis or assessment of "conditions." Section 20-9 (a) provides in relevant part that "[n]o person shall . . . diagnose, treat, operate for or prescribe for any *injury, deformity, ailment or disease* . . . until he has obtained [a] license." (Emphasis added.) By its plain language, and the common meanings associated therewith, this statute defines the scope

of unauthorized practice of medicine specifically in terms of abnormalities or deviations from a healthy state of being.[5] See *State Medical Society* v. *Connecticut Board of Examiners in Podiatry*, supra, 208 Conn. 727 (trial court did not err in relying on common usage and dictionary definition of "foot" when construing General Statutes § 20-50 to determine scope of practice for podiatry and concluding that "foot" did not include "ankle"). The term "condition," by contrast, is defined more broadly as the "mode or state of being" of a person or thing, which is expansive enough to encompass even a healthy state of being. American Heritage College Dictionary (2d Ed. 1985). Indeed, the use of condition to refer to ailments or diseases (e.g., heart condition) had been challenged as an improper use of the term. See id. ("Usage: Condition . . . in the sense of 'disease' or 'ailment' . . . is not a scientific term and has been objected to as a euphemism"). Accordingly, the statute's specific focus on illness, injury, deformity and ailment is inconsistent with the intent to include the broader scope expressed by "condition."[6]

---

[5] "Ailment" is defined as "a physical or mental disorder, esp. a mild illness." American Heritage College Dictionary (2d Ed. 1985). "Deformity" is defined as "the state of being deformed," while "deformed" is defined as "misshapen or distorted in form." Id. "Disease" is defined as "an abnormal condition of an organism or part, esp. as a consequence of infection, inherent weakness, or environmental stress, that impairs normal physiological functioning." Id. "Illness" is defined as "sickness of body or mind." Id.

[6] We are not persuaded by the board's assertion that its interpretation of § 20-9 is entitled to deference. The board's reliance on *Leib* v. *Board of Examiners for Nursing*, 177 Conn. 78, 411 A.2d 42 (1979), for the proposition that the agency is given authority to determine the parameters of a statute is misplaced. In *Leib*, the statute contained the nonexclusive language "includ[ing] . . . but not limited to," which our Supreme Court concluded was indicative of legislative intent to delegate to the agency the duty of ascertaining the acts falling within the ambit of the statute. Id., 88–90. Here, however, there is no such expansive language indicating that the statute sets forth a nonexclusive list.

We also find that the board's reliance on *Cos Cob Volunteer Fire Co. No. 1, Inc.* v. *Freedom of Information Commission*, 212 Conn. 100, 561 A.2d 429 (1989), is similarly misplaced. In that case, the court concluded that the legislature's use of the word "operational meeting," without further

Because part one of the revised order, as drafted, exceeds the scope of the board's statutory authority, we further conclude that it improperly purports to regulate midwifery as the unauthorized practice of medicine. In reaching this conclusion, we find the principles set forth in other jurisdictions persuasive. In *State ex rel. State Board of Nursing* v. *Ruebke*, 259 Kan. 599, 913 P.2d 142 (1996), the contested statute also defined the unauthorized practice of medicine in the scope of abnormalities and pathologies. Id., 615. Concluding that "[p]regnancy and childbirth [were] neither pathologies nor abnormalities," the Kansas Supreme Court held that midwifery, in the context of a normal pregnancy, did not constitute the unauthorized practice of medicine.[7] Id., 615–16. Similarly, in *State* v. *Banti*, 163 Tex. Crim. 89, 289 S.W.2d 244 (Tex. Crim. App. 1956), the court of criminal appeals in Texas held that assisting a woman with childbirth did not establish that the defendant treated the woman for a "disease, disorder, deformity, or injury" so as to constitute the unauthorized practice of medicine. Id., 92. In the present case, experts opined that normal pregnancies are not considered illnesses, deformities, ailments or diseases. In fact, the dictionary defines pregnancy as the "*condition* of being pregnant." (Emphasis added.) American Heritage College Dictionary, supra. Accordingly, diagnosis or assessment rendered in relation to normal pregnancies would not place an individual's actions within the ambit of § 20-9. In light of the

providing criteria for determining what activities constituted "operational" or defining the term evinces legislative intent that the agency should define the parameters of the term. Id., 106. In the present case, the legislature did not use the broad term "condition," but instead set forth an exhaustive list composed entirely of four specific terms with narrow definitions pertaining to abnormal states of health.

[7] We note that those jurisdictions reaching the opposite conclusion—that midwifery does constitute the unauthorized practice of medicine—define the scope of medicine more broadly to include conditions as well as abnormalities and pathologies. See, e.g., *Smith* v. *State ex rel. Medical Licensing Board of Indiana*, 459 N.E.2d 401, 403–404 (Ind. App. 1984); see also *State ex rel. State Board of Nursing* v. *Ruebke*, supra, 259 Kan. 616.

foregoing, we conclude that the use of the word "condition" in part one of the revised order purported to expand the board's jurisdiction. We further conclude that the board lacks the power to regulate the diagnosis and assessment of "conditions" where the plain language of § 20-9 contemplates no such authority.[8]

Because we have determined that part one of the revised order exceeded the board's statutory authority, it follows that the court improperly dismissed the plaintiffs' appeal. Section 4-183 (j) provides in relevant part that a court may render a judgment under § 4-183 (k) or remand the case to the agency for further proceedings if the court found that the rights of the person appealing have been prejudiced because the agency's decision is in excess of the statutory authority of the agency. Although the court, in its April 5, 2011 memorandum of decision, observed that part one of the revised order was overbroad, it nevertheless dismissed the plaintiffs' appeal and instead attempted to limit the scope of part one through its April 28, 2011 opinion. After concluding that part one was overbroad, the court should have sustained the appeal on the ground that the decision exceeded the agency's statutory authority and taken

---

[8] Because our conclusions regarding this issue are dispositive, we need not address the plaintiffs' remaining claims as to why the board's first order is erroneous. We therefore decline to address the plaintiffs' claims that the board's order (1) unlawfully restricts common law practice of midwifery and (2) renders the § 20-9 unconstitutionally vague and overbroad. For the same reason, we also decline to address the board's claims on cross appeal that the court erred in concluding that the first order was overbroad, or, alternatively, that this court should remand the matter to the board for further proceedings if we conclude that the trial court correctly determined that the order was overbroad.

The plaintiffs' assertion that court erred in referring to repealed statutes that had previously regulated to practice of midwifery is without merit. The plaintiffs, in their argument, misinterpret and mischaracterize trial court's language as an attempt to resurrect these repealed statutes and incorporate them into § 20-9. In context, the court's reference to these statutes served only to provide an example of the traditional roles of midwives. We therefore conclude that the trial court did not err.

the appropriate remedial action by either remanding to the agency for further proceedings, modifying the agency decision, ordering a particular agency action, or ordering the agency to such action necessary to effect the particular action.[9] General Statutes § 4-183 (j) and (k).

The judgment of the trial court is reversed with respect to its dismissal of part one of the board's order and the case is remanded to that court with direction to sustain the plaintiffs' appeal and to render judgment modifying the board's final decision to eliminate part one of the order in its entirety. The judgment is affirmed in all other respects.

In this opinion LAVINE, J. concurred.

BEAR, J., concurring. I concur in the result that the majority reaches in part I of its opinion. I otherwise join the majority opinion.

---

[9] Because the scope of a midwife's practice is not before us on this appeal, we do not establish the boundaries of what a midwife may do without engaging in the unauthorized practice of medicine.