Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/06/2024 09:06 AM CDT

State of Nebraska, appellant,
v. Judy K. Jones, appellee.
___ N.W.3d ___

Filed September 6, 2024.    Nos. S-23-402, S-23-508.

1. **Judgments: Plea in Abatement: Appeal and Error.** Regarding questions of law presented by a plea in abatement, an appellate court is obligated to reach a conclusion independent of the determinations reached by the trial court.

2. **Constitutional Law: Statutes: Judgments: Appeal and Error.** The constitutionality and construction of statutes are questions of law, regarding which appellate courts are obligated to reach conclusions independent of those reached by the court below.

3. **Preliminary Hearings: Plea in Abatement.** A plea in abatement is used to challenge the sufficiency of the evidence at a preliminary hearing.

4. **Plea in Abatement: Probable Cause: Evidence: Verdicts.** To resist a challenge by a plea in abatement, the evidence received by the committing magistrate need show only that a crime was committed and that there is probable cause to believe that the accused committed it. The evidence need not be sufficient to sustain a verdict of guilty beyond a reasonable doubt.

5. **Statutes: Legislature: Intent.** The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent.

6. **Statutes.** Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.

7. ____. It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.

8. **Statutes: Legislature: Intent.** In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the

intent as deduced from the whole will prevail over that of a particular part considered separately.

9. **Statutes.** Statutes pertaining to the same subject matter should be construed together; such statutes, being in pari materia, must be construed as if they were one law, and effect must be given to every provision.

10. \_\_\_\_. To give effect to all parts of a statute, a court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.

11. **Constitutional Law: Criminal Law: Statutes.** The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

12. **Constitutional Law: Statutes: Legislature: Notice.** The more important aspect of the void-for-vagueness doctrine is not actual notice, but the requirement that a legislature establish minimal guidelines to govern law enforcement.

13. **Constitutional Law: Statutes: Proof.** A plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the act would be valid, i.e., that the law is unconstitutional in all of its applications.

Appeals from the District Court for Madison County, James G. Kube, Judge, and the District Court for Douglas County, Todd O. Engleman, Judge. Reversed and remanded for further proceedings.

Michael T. Hilgers, Attorney General, Eric J. Hamilton, and John J. Schoettle for appellant.

Kirk E. Goettsch, of Goettsch Law Firm, L.L.C., and Stuart J. Dornan and Keith W. Dornan, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellee.

William R. Settles, of Lamson, Dugan & Murray, L.L.P., for amicus curiae Nebraska Medical Association.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Funke, J.

## I. INTRODUCTION

In two separate criminal cases, the State charged a self-described "lay midwife" with violating the Uniform Credentialing Act (UCA)[1] by practicing a profession or occupation without a credential after having been ordered to cease and desist. The midwife filed a plea in abatement in each case challenging the sufficiency of the evidence to show that she had committed the charged crime. In each case, the district court sustained the plea in abatement primarily because it found that "nurse midwives" were not required to hold credentials under the UCA to practice in Nebraska. The district court also suggested in each case that the UCA would be unconstitutionally vague if it was construed to require a credential to practice "nurse midwifery."

The State appealed both orders of the district court. Because we agree with the State that in both cases, the district court misconstrued the UCA and erred in suggesting that the UCA was void for vagueness, we reverse the orders of the district court sustaining the midwife's pleas in abatement and dismissing the charges against her and remand both causes for further proceedings consistent with this opinion.

For clarity, we note that even though two cases are at issue here, one in Madison County and one in Douglas County, we refer to the district court in its singular form, in keeping with *Garrotto v. McManus*.[2] *In Garrotto*, we concluded that under article V of the Nebraska Constitution, the district court was a court of general jurisdiction of this state, which was divided into judicial districts for the transaction of judicial business, but that so far as the creation of a court was concerned, the

---

[1] Neb. Rev. Stat. § 38-101 et seq. (Reissue 2016, Cum. Supp. 2020, and Supp. 2021). See, also, § 38-113 (defining "[c]redential" to mean license, certificate, or registration).

[2] *Garrotto v. McManus*, 185 Neb. 644, 177 N.W.2d 570 (1970).

district court was one court of general jurisdiction with interchangeable judges, all exercising the same jurisdiction.[3]

## II. BACKGROUND

Judy K. Jones variously describes herself as a "lay midwife," a "direct entry midwife," and a "midwife, pure and simple."[4] Jones also claims to be a "Certified Professional Midwife," which, according to Jones, involves certification by the North American Registry of Midwives. Jones acknowledges that she does not hold a credential issued by the State of Nebraska under the UCA to practice medicine and surgery, advanced practice registered nursing, or certified nurse midwifery.

### 1. Charges Against Jones

Although not reflected in the record on appeal, the State filed a criminal complaint against Jones in Madison County, Nebraska, at some time prior to October 2022. Later, in December 2022, the State also filed a criminal complaint against Jones in Douglas County, Nebraska. The Douglas County charges are part of the record on appeal and allege that Jones failed to cease and desist from the unlicensed practice of "[n]urse [m]idwifery" in violation of §§ 38-1,124 and 38-121. Collectively, the cited statutes prohibit individuals from engaging in specific practices without obtaining a credential under the UCA, authorize the issuance of orders to cease and desist the unauthorized practice of such professions, and make practicing a profession without the requisite credential after receiving a cease-and-desist order a Class III felony.

In each case, the county court held a preliminary hearing and found that the evidence showed probable cause that Jones had committed the charged crime. Accordingly, the county

---

[3] *Id.*

[4] Brief for appellee in case No. S-23-402 at 43; brief for appellee in case No. S-23-508 at 39.

court in each case bound the case over to the district court for arraignment and trial.

The State then filed an information in the district court for Madison County charging Jones with failing to cease and desist from the unlicensed practice of nurse midwifery. A virtually identical information was filed in the district court for Douglas County.

### 2. Jones' Pleas in Abatement, Motions to Quash, and Demurrers

Jones filed a plea in abatement with the district court in each case, alleging that the information should be dismissed because "insufficient evidence [was] adduced at the preliminary hearing to support a finding of probable cause to believe that the charged crimes were committed and [she] committed them."

Jones also filed a motion to quash and a demurrer in each case, seeking the dismissal of the information on statutory and constitutional grounds. In those filings, Jones argued that "[l]ay [m]idwifery"—which is what she purports to practice—was not among the practices listed in § 38-121(1) as requiring a credential under the UCA. Jones also argued that "[c]ertified [n]urse [m]idwifery"—which Jones maintains is distinct from lay midwifery—was also not listed in § 38-121(1). In addition, Jones argued that § 38-121 was unconstitutionally overbroad and vague; infringed on her rights to due process and freedom of religion, association, and assembly; and violated the Commerce Clause of the U.S. Constitution.

### 3. Madison County District Court Hearing and Order

In February 2023, the district court for Madison County held a hearing on Jones' filings. At the hearing, Jones argued that the only evidence introduced at the preliminary hearing was that she "was present during the birth of a child" and "provid[ed] some prenatal care." But Jones offered no evidence in support of that argument beyond a copy of § 38-121.

Following the hearing, the district court sustained Jones' plea in abatement and dismissed the information. The district court reasoned that "nurse midwifery" was not listed in § 38-121 and that, as such, a "reasonable person" reading that statute "would not conclude that certification [was] required under Nebraska law in order to [practice] nurse midwifery" in Nebraska. The district court also expressly rejected the State's argument that the Certified Nurse Midwifery Practice Act[5] required "a person practicing midwifery" to be certified under § 38-121(1). Accordingly, the district court concluded that the evidence adduced at the preliminary hearing was insufficient to support a finding that Jones had committed the charged crime.

The district court did not rule on Jones' motion to quash or demurrer.

## 4. Douglas County District Court
### Hearing and Order

Subsequently, in April 2023, the district court for Douglas County held a hearing on Jones' filings. At the hearing, Jones offered and the district court received into evidence a copy of the order from the Madison County District Court sustaining her plea in abatement, as well as the bill of exceptions of the preliminary hearing in the county court for Douglas County. Because the bill of exceptions describes conduct by Jones that, in part, forms the basis for our conclusions below, we describe its contents in some detail here.

As set forth in the bill of exceptions, law enforcement was called to the scene of an at-home birth during which complications in the child's health necessitated emergency care. At the scene, officers spoke with Jones, who identified herself as a certified professional midwife "assisting the birth." Other persons present included the child's family and an "apprentice midwife." Jones told officers that the child was born with her umbilical cord wrapped around her neck, which caused

---

[5] Neb. Rev. Stat. §§ 38-601 to 38-618 (Reissue 2016 & Cum. Supp. 2022).

asphyxiation. Jones administered CPR on the child before the child was taken to a hospital, where she died.

According to the bill of exceptions, an investigation revealed that the parents had hired Jones as a midwife to perform prenatal and postnatal care and assist with the child's delivery. The parents said that they planned for a home birth, and emergency medical personnel who responded to the scene stated that the scene indicated a planned home birth. Jones initially made monthly visits to the home, then weekly visits as the mother's due date drew closer. The investigation also revealed that in 2012, Jones was ordered to cease and desist from "the unlicensed practice of medicine and surgery" after attending the birth of a child who later died. The 2012 cease-and-desist order also stated that Jones had previously received a cease-and-desist order in 1999.

As described in the bill of exceptions, the parents provided officers with a "prenatal record" detailing the care Jones provided throughout the pregnancy and other documentation. The prenatal record showed that during the pregnancy, Jones obtained a history of the mother's prior pregnancies; tested the mother's urine; checked the mother's blood pressure and the child's fetal heart tone; measured fundal height; recommended treatments; and suggested dosages of probiotics, vitamins, and medicinal supplements to deal with the mother's symptoms. The prenatal record also documented that during the birth, Jones tracked contractions, took fetal heart tone readings, performed pelvic examinations, measured cervix effacement and dilation, administered treatments and remedies to facilitate the birth, and assisted with the child's delivery. The apprentice midwife told officers that she accompanied Jones on some prenatal visits and was present at the birth, that Jones provided care for the mother and the child, and that the apprentice midwife took notes of what was happening during the visits.

After the hearing, the district court sustained Jones' plea in abatement and dismissed the information. In so doing, the

court referred to and agreed with the analysis of the Madison County District Court, construing the UCA in a nearly identical manner.

Like the Madison County District Court, the Douglas County District Court did not rule on Jones' motion to quash or demurrer.

### 5. STATE APPEALS DISTRICT COURT'S ORDERS

The State timely appealed each of the district court's orders sustaining Jones' plea in abatement, and we moved the cases to our docket, consolidating them for purposes of the present appeal.[6] The Nebraska Medical Association filed an amicus curiae brief in support of the State.

## III. ASSIGNMENTS OF ERROR

The State assigns, restated, that the district court erred in finding that (1) § 38-121 does not bar Jones from practicing "nurse midwifery" without a credential and (2) § 38-121 would be unconstitutionally vague if it were construed to require "nurse midwives" to be licensed.

## IV. STANDARD OF REVIEW

[1,2] Regarding questions of law presented by a plea in abatement, an appellate court is obligated to reach a conclusion independent of the determinations reached by the trial court.[7] The constitutionality and construction of statutes are questions of law, regarding which appellate courts are obligated to reach conclusions independent of those reached by the court below.[8]

## V. ANALYSIS

[3,4] As set forth above, this appeal arises from the orders of the district court sustaining Jones' pleas in abatement. Criminal defendants who wish to challenge the sufficiency of

---

[6] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

[7] *State v. Jedlicka*, 305 Neb. 52, 938 N.W.2d 854 (2020).

[8] *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023).

the charges against them do so by filing a plea in abatement or motion to quash.[9] Specifically, a plea in abatement is used to challenge the sufficiency of the evidence at a preliminary hearing.[10] To resist a challenge by a plea in abatement, the evidence received by the committing magistrate need show only that a crime was committed and that there is probable cause to believe that the accused committed it.[11] The evidence need not be sufficient to sustain a verdict of guilty beyond a reasonable doubt.[12]

The State's assignments of error expressly mention "nurse midwifery" without referencing the evidence or even the district court's rulings on Jones' pleas in abatement. However, we understand the State's assignments of error to mean that if the district court had properly construed the provisions of the UCA pertaining to "nurse midwives" and properly assessed Jones' claim of vagueness, the district court would have found that the evidence was sufficient to show probable cause that Jones committed the charged crime.

### 1. District Court Misconstrued UCA

The State's first assignment of error concerns the district court's construction of the UCA. The State argues that the district court erred by looking primarily to the list of practices requiring a credential set forth in § 38-121(1) when sustaining Jones' pleas in abatement. According to the State, in so doing, the district court "misread[]" § 38-121 and "fail[ed] to interpret" § 38-121 "alongside the rest of the UCA."[13] Instead, the State points to other provisions of the UCA regarding the practice of medicine and surgery, advanced practiced registered nursing, and certified nurse midwifery. The State argues

---

[9] See *State v. Loyd*, 269 Neb. 762, 696 N.W.2d 860 (2005).

[10] *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020).

[11] *State v. Lasu*, 278 Neb. 180, 768 N.W.2d 447 (2009).

[12] *Id*.

[13] Brief for appellant in case No. S-23-402 at 16; brief for appellant in case No. S-23-508 at 18.

that under those provisions, in Nebraska, an individual must hold a credential under the UCA to engage in the conduct in which Jones allegedly engaged.

Jones' arguments are more elusive. Jones argues that neither "midwifery" nor "nurse midwifery" is listed in § 38-121(1) or defined in Nebraska statute and that there is "no plain or express [statutory] prohibition on the practice of lay-midwifery."[14] Jones concedes that an individual must hold a credential under the UCA to practice "nursing, medicine, or another practice or business for which a credential is required under the [UCA]."[15] But Jones maintains that lay midwives do not practice medicine and surgery and that there was no evidence of conduct by her that can be seen to constitute a practice requiring a credential under the UCA.

Ultimately, we agree with the State that, in Nebraska, individuals who engage in the conduct in which Jones allegedly engaged are generally required to hold a credential under the UCA. That conclusion is based on our familiar principles of statutory interpretation, which we briefly review below.

[5-7] As we have repeatedly stated, the fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent.[16] Statutory interpretation begins with the text, and the text is to be given its plain and ordinary meaning.[17] It is not within the province of a court to read a meaning into a statute that is not warranted by the language; neither is it within the province of a court to read anything plain, direct, or unambiguous out of a statute.[18]

---

[14] Brief for appellee in case No. S-23-402 at 24; brief for appellee in case No. S-23-508 at 21.

[15] Brief for appellee in case No. S-23-402 at 27; brief for appellee in case No. S-23-508 at 25.

[16] *Dirt Road Development v. Hirschman*, 316 Neb. 757, 7 N.W.3d 438 (2024).

[17] *Id*.

[18] *Id*.

[8-10] In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.[19] Statutes pertaining to the same subject matter should be construed together; such statutes, being in pari materia, must be construed as if they were one law, and effect must be given to every provision.[20] To give effect to all parts of a statute, a court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.[21]

### (a) § 38-121(1) Must Be Construed in Conjunction With Various "Practice Acts"

Section 38-121(1) prohibits individuals from engaging in specified "practices" without obtaining a credential under the UCA. However, other provisions of the UCA, referred to as "Practice Act[s],"[22] define what constitutes the scope of practice for each of the professions or occupations listed in § 38-121(1).[23] In other words, each "Practice Act" specifies which persons are deemed to be engaged in that profession or occupation or what practices constitute the profession or occupation. The "Practice Acts" also set forth exceptions that permit persons not holding a credential in that profession or occupation to engage in conduct within the scope of practice of that profession or occupation without violating the UCA.[24]

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] See § 38-101.

[23] See, e.g., Neb. Rev. Stat. §§ 38-311 and 38-408 (Reissue 2016).

[24] See, e.g., Neb. Rev. Stat. §§ 38-312 and 38-409 (Reissue 2016).

Read together, the foregoing provisions of the UCA make clear that looking solely at the list of practices in § 38-121(1) is insufficient to determine whether a credential is required for a purported profession or occupation. Instead, one must look to the conduct involved in the purported profession or occupation to determine whether that conduct is within the scope of practice of a profession or occupation listed in § 38-121(1). We previously said essentially this in *State ex rel. Dept. of Health v. Jeffrey*.[25]

The defendant in *Jeffrey* purported to practice "equine dentistry."[26] But we agreed with the district court that the defendant was engaged in the practice of veterinary medicine and, as such, was required to hold a credential under what was then known as the Uniform Licensing Law.[27] We reached this conclusion by considering the defendant's "conduct as presented in the record" in conjunction with the scope of practice of veterinary medicine, as set forth in statute.[28] A contrary approach would, as the State argues in this case, allow persons to "evade licensing requirements" merely by giving a different name to conduct that is within the scope of practice of a profession or occupation listed in § 38-121(1).[29]

Insofar as the district court focused primarily on whether "nurse midwifery" was listed in § 38-121(1) when sustaining Jones' pleas in abatement, it erred. Jones' arguments on appeal that the terms "midwifery" and "nurse midwifery" are not defined in the UCA and that there is no statutory prohibition upon "lay midwifery" are premised on a similar misunderstanding of the UCA as a whole.

---

[25] *State ex rel. Dept. of Health v. Jeffrey*, 247 Neb. 100, 525 N.W.2d 193 (1994).

[26] *Id*. at 103, 525 N.W.2d at 198.

[27] *Jeffrey, supra* note 25.

[28] *Id*. at 103, 525 N.W.2d at 198.

[29] Brief for appellant in case No. S-23-402 at 17; brief for appellant in case No. S-23-508 at 18-19.

### (b) UCA Requires Credential to Attend
### Cases of Normal Childbirth and
### Perform Related Functions

Three specific "Practice Act[s]" are relevant here: the Medicine and Surgery Practice Act,[30] the Advanced Practice Registered Nurse Practice Act (APRN Practice Act),[31] and the Certified Nurse Midwifery Practice Act. The first of these acts prescribes that

> the following classes of persons shall be deemed to be engaged in the practice of medicine and surgery:
>
> (1) Persons who publicly profess to be physicians or surgeons or publicly profess to assume the duties incident to the practice of medicine, surgery, or any of their branches;
>
> (2) Persons who prescribe and furnish medicine for some illness, disease, ailment, injury, pain, deformity, or any physical or mental condition, or treat the same by surgery;
>
> (3) Persons holding themselves out to the public as being qualified in the diagnosis or treatment of diseases, ailments, pain, deformity, or any physical or mental condition, or injuries of human beings; [and]
>
> (4) Persons who suggest, recommend, or prescribe any form of treatment for the intended palliation, relief, or cure of any physical or mental ailment of any person.[32]

However, the Medicine and Surgery Practice Act includes certain exceptions that allow persons to engage in conduct within the scope of the practice of medicine and surgery without "be[ing] construed to be engaged in the unauthorized practice of medicine."[33] One of those exceptions encompasses

---

[30] Neb. Rev. Stat. §§ 38-2001 to 38-2062 (Reissue 2016 & Cum. Supp. 2020).

[31] Neb. Rev. Stat. §§ 38-201 to 38-212 (Reissue 2016 & Cum. Supp. 2020).

[32] § 38-2024.

[33] § 38-2025.

advanced practice registered nurses "practicing in their clinical specialty areas when licensed under the [APRN Practice Act] and practicing under and in accordance with their respective practice acts."[34]

In turn, the APRN Practice Act requires, among other things, that an individual be licensed as a registered nurse and certified as a certified nurse midwife or another type of practitioner not relevant here.[35] The Certified Nurse Midwifery Practice Act similarly requires that applicants for licensure under the APRN Practice Act to practice as a certified nurse midwife shall show that they are currently licensed as a registered nurse or have the authority to practice as such and that they are certified as a nurse midwife by a board-approved certifying body.[36]

The Certified Nurse Midwifery Practice Act allows certified nurse midwives, under the provisions of a practice agreement, to "(1) attend cases of normal childbirth, (2) provide prenatal, intrapartum, and postpartum care, (3) provide normal obstetrical and gynecological services for women, and (4) provide care for the newborn immediately following birth."[37] The Certified Nurse Midwifery Practice Act also prescribes that the "functions" of a certified nurse midwife may be performed (1) by an unlicensed person in an emergency, (2) by legally qualified persons from other states who are employed by the federal government and are performing official duties in Nebraska, or (3) by persons enrolled in a certified nurse

---

[34] § 38-2025(16).

[35] See § 38-208(1)(a) and (c).

[36] See § 38-615(1).

[37] § 38-611. See, also, § 38-308 (defining "[l]icensed practitioner" to mean "any physician licensed to practice pursuant to the Medicine and Surgery Practice Act, whose practice includes obstetrics") and § 38-609 (defining "[p]ractice agreement" to mean agreement between certified nurse midwife and licensed practitioner that identifies settings in which certified nurse midwife is authorized to practice and medical functions to be performed by certified nurse midwife, among other things).

midwife program as part of that program.[38] Notably, those are the only exceptions set forth in the Certified Nurse Midwifery Practice Act.

Jones concedes that a credential is required to practice medicine and surgery, but she maintains that "lay midwives" do not practice medicine and surgery. The scope of the practice of medicine and surgery includes prescribing and furnishing medicine for "any physical or mental condition" and holding oneself out as being qualified in the diagnosis of "any physical or mental condition," among other things.[39] However, Jones argues that pregnancy cannot be seen as a "condition," as that term is used here, because pregnancy is a "normal bodily function of womanhood."[40] Jones bases this argument primarily on the opinion of the Kansas Supreme Court in *State Bd. of Nursing v. Ruebke*.[41] In *Ruebke*, the Kansas court affirmed a lower court's order declining to enjoin a "lay midwife" from practicing medicine and surgery without a license.[42] In so doing, the Kansas court looked to a statutory definition of the "healing arts" that it construed to "focus exclusively on pathologies (*i.e.*, diseases) and abnormal human conditions (*i.e.*, ailments, deformities, or injuries)."[43] But the Kansas court reasoned that "[p]regnancy and childbirth are neither pathologies nor abnormalities."[44]

Jones urges that the term "condition" in Nebraska's Medicine and Surgery Practice Act be similarly construed not

---

[38] See § 38-612.

[39] § 38-2024(2) and (3).

[40] Brief for appellee in case No. S-23-402 at 30. See brief for appellee in case No. S-23-508 at 28.

[41] *State Bd. of Nursing v. Ruebke*, 259 Kan. 599, 913 P.2d 142 (1996). See, also, *Banti v. State*, 163 Tex. Crim. 89, 92, 289 S.W.2d 244, 247 (1956) ("[w]e agree that childbirth is a normal function of womanhood . . . .").

[42] *Ruebke, supra* note 41.

[43] *Id*. at 615, 913 P.2d at 155.

[44] *Id*.

to encompass pregnancy and childbirth. We disagree. The parties do not suggest that "condition" is a term of art. As such, we look to the plain and ordinary meaning of the term as set forth in dictionaries from the time of the enactment of the relevant provisions of the UCA.[45] Such definitions of "condition" include any "state of being" or "[s]tate of health"; they are not limited to pathologies or abnormalities.[46]

Other courts have taken a similar view, declining to follow *Ruebke* where they found that the language used in their credentialing statutes was broader than that used in the Kansas statute defining the "healing arts." For example, in *People ex rel. Sherman v. Cryns*,[47] the Illinois Supreme Court rejected a lay midwife's claim that she did not engage in the practice of nursing or advanced practice nursing under that state's statutes. The midwife relied, in part, on *Ruebke*.[48] But the Illinois court found that *Ruebke* was "inapposite" because the Illinois statute defined the relevant terms in a "broader manner" than the Kansas statute defined the "'healing arts.'"[49] The Illinois court also found that the statute at issue in *Cryns* was different from the statute at issue in *People v. Jihan*,[50] another case upon which Jones relies.

---

[45] 1969 Neb. Laws, ch. 563, § 1, p. 2291. See *State v. Dailey*, 314 Neb. 325, 990 N.W.2d 523 (2023) (it is fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at time Legislature enacted statute, and Nebraska courts often turn to dictionaries to ascertain word's plain and ordinary meaning).

[46] See, e.g., The American Heritage Dictionary of the English Language 277 (1969).

[47] *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 786 N.E.2d 139, 271 Ill. Dec. 881 (2003). See, also, *Bowland v. Municipal Court*, 18 Cal. 3d 479, 556 P.2d 1081, 134 Cal. Rptr. 630 (1976); *Smith v. State ex rel. Medical Licensing Bd.*, 459 N.E.2d 401 (Ind. App. 1984).

[48] See *Cryns, supra* note 47.

[49] *Id*. at 295, 786 N.E.2d at 160, 271 Ill. Dec. at 902.

[50] *People v. Jihan*, 127 Ill. 2d 379, 537 N.E.2d 751, 130 Ill. Dec. 422 (1989).

Jones' related arguments about how lay midwives differ from certified nurse midwives are similarly unavailing. Jones points to legislative history materials and other authorities that she claims show that the Legislature's failure to use or define the term "lay midwife" reflects an intent not to regulate lay midwives, whom Jones claims provide a vital service to families seeking a home birth. Even if those arguments were seen to have some merit, the Legislature broadly prescribed that the functions of certified nurse midwives include, among other things, "attend[ing]" cases of normal childbirth and providing normal obstetrical and gynecological services for women.[51] The Legislature also provided that unlicensed persons may perform the functions of certified nurse midwives only in emergencies or other circumstances not alleged to be present here.[52] We are bound by the Legislature's choice of words. As was previously noted, it is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.[53]

### (c) Evidence Sufficed to Show Probable Cause That Jones Engaged in Conduct Requiring Credential Under UCA

We similarly reject Jones' argument that there was no evidence of any conduct by her that could be seen to constitute the practice of medicine and surgery or any other profession requiring a credential under the UCA. Jones bases this argument on somewhat different grounds in each case. In the Douglas County case, Jones maintains that the evidence of her conduct failed to show the practice of medicine and surgery. Jones argues that the evidence in the Douglas County case

---

[51] See § 38-611. See, also, *Williams v. State*, 118 Neb. 281, 224 N.W. 286 (1929) (suggesting that delivery of baby was within scope of practice of medicine, surgery, and obstetrics but that nurse's delivery of baby was permissible under exceptions to scope of such practice).

[52] See § 38-612.

[53] *State v. Godek*, 312 Neb. 1004, 981 N.W.2d 810 (2022).

was limited to the "'[p]renatal [r]ecord'"[54] of her contacts with the mother and that the care that she provided to the mother was limited to "over the counter" items.[55] As such, Jones suggests that her conduct fell within the exception set forth in the Medicine and Surgery Practice Act for persons administering "ordinary household remedies."[56] In contrast, in the Madison County case, Jones argues that there was no evidence of her conduct or that she previously received a cease-and-desist order, with the apparent implication that this defect is chargeable to the State.[57] We take a different view of the evidence in both cases.

In the Douglas County case, the evidence was not limited to the prenatal record, as Jones suggests. There was also testimony from the officer who investigated the child's death and a copy of the 2012 cease-and-desist order. More importantly, that evidence showed conduct by Jones that went beyond administering "ordinary household remedies." Specifically, the evidence showed that Jones was paid by the child's parents to perform prenatal and postnatal care and assist with the delivery of the child; that during her prenatal visits, Jones measured fundal height, tested the mother's urine, and checked the mother's blood pressure and the child's fetal heart tone; that during the labor, Jones tracked contractions and the child's fetal heart tone, performed pelvic examinations and measured cervix effacement and dilation, and assisted with the delivery; that Jones provided care while the apprentice midwife took notes; and that Jones removed the umbilical cord from around the child's neck and performed CPR on her. Under the scope of the practice of medicine and surgery

---

[54] Brief for appellee in case No. S-23-508 at 25.

[55] *Id.* at 26.

[56] § 38-2025(2).

[57] See, e.g., *Clarke v. First Nat. Bank of Omaha*, 296 Neb. 632, 895 N.W.2d 284 (2017) (it is appellant's burden to create record for appellate court which supports errors assigned).

and certified nurse midwifery set forth above, this evidence sufficed to show probable cause that Jones committed the charged crime. Whether it is sufficient for a conviction is another matter not at issue in this appeal.

Similarly, the record in the Madison County case shows that Jones conceded in the proceedings before the district court that she "provided prenatal care," "was present during the birth of a child," and had received a cease-and-desist order in 2012. As to the absence of additional evidence of Jones' conduct, we view this as chargeable to Jones, and not the State, because Jones interposed the plea in abatement.

We have stated on several occasions, albeit in civil matters, that a plea in abatement will generally not be sustained "unless the party interposing it clearly shows that he or she is within its purpose," meaning that it is the party who brings the plea in abatement who has the burden of showing it should be sustained.[58] As such, Jones had the burden to establish that her plea in abatement should be sustained because the evidence presented by the State at the preliminary hearing did not show that she committed the charged crime. Jones failed to meet that burden insofar as the only evidence that she offered at the hearing before the district court was a copy of § 38-121.

## 2. District Court Erred to Extent It Found UCA Void for Vagueness

The State also assigns that the district court erred to the extent it concluded that the relevant provisions of the UCA would be unconstitutionally vague if they were construed to apply to "nurse midwifery." The State argues that any

---

[58] *Larsen v. First Bank*, 245 Neb. 950, 956, 515 N.W.2d 804, 810 (1994). See, also, *Kash v. McDermott & Miller*, 221 Neb. 297, 376 N.W.2d 558 (1985) (plea in abatement generally will not be sustained unless party interposing it can show that he or she is within reason for its enforcement); *National Bank of Commerce T. & S. Assn. v. Shull*, 195 Neb. 590, 239 N.W.2d 505 (1976) (same).

such conclusion was erroneous because Jones lacked standing to challenge the relevant provisions of the UCA and because those provisions are not unconstitutionally vague. Jones counters that the district court properly determined that the UCA was unconstitutionally vague because "no definition of 'midwife', 'midwifery', or 'nurse midwifery' exists in any Nebraska statute or appellate opinion."[59] As such, Jones argues that the UCA fails to inform a lay or direct-entry midwife that they would be "exposed to criminal sanctions for engaging in their vocation."[60]

[11,12] The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.[61] The more important aspect of the void-for-vagueness doctrine is not actual notice, but the requirement that a legislature establish minimal guidelines to govern law enforcement.[62]

To have standing to assert a claim of vagueness, a defendant must not have engaged in conduct which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others.[63] A court will not examine the vagueness of the law as it might apply to the conduct of persons not before the court.[64] The test for standing to assert a vagueness challenge is the same whether the challenge asserted is facial or as applied.[65]

---

[59] Brief for appellee in case No. S-23-402 at 47; brief for appellee in case No. S-23-508 at 44.

[60] Brief for appellee in case No. S-23-402 at 47; brief for appellee in case No. S-23-508 at 45.

[61] *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014).

[62] *Id*.

[63] *Id*.

[64] *Id*.

[65] *Id*.

[13] Even assuming that Jones has standing to raise a claim of vagueness here, we agree with the State that the district court erred to the extent it suggested that the UCA would be void for vagueness if it were construed to apply to "nurse midwifery," a term that the district court apparently used interchangeably with "midwifery" and "lay midwifery." A challenge to a statute asserting that no valid application of the statute exists because it is unconstitutional on its face is a facial challenge.[66] A plaintiff can only succeed in a facial challenge by establishing that no set of circumstances exists under which the act would be valid, i.e., that the law is unconstitutional in all of its applications.[67] However, the proper procedure to bring a constitutional challenge to the facial validity of a statute is to file a motion to quash.[68] Jones filed a motion to quash in each case, challenging the charges against her on overbreadth, vagueness, and other grounds. But the district court did not rule on Jones' motions to quash here. Instead, it ruled on Jones' pleas in abatement, and, as we stated above, a plea in abatement is concerned with the sufficiency of the evidence.[69]

Upon remand, the district court should consider Jones' motions to quash and demurrers.

### 3. Other Issues Not Properly Before Court on Appeal

The parties also touch on other issues in their briefs on appeal. Notably, Jones suggests that there were defects in the State's information in each case. Jones also cites the proposition that an appellate court may affirm a decision of a trial court that is correct, even if such correctness is based on a

---

[66] *State v. Cornwell*, 294 Neb. 799, 884 N.W.2d 722 (2016).

[67] *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017).

[68] See *id.*

[69] See *Anderson, supra* note 10. See, also, *State v. Loyuk*, 289 Neb. 967, 857 N.W.2d 833 (2015) (generally, in challenge to overbreadth and vagueness of law, court's first task is to analyze overbreadth).

ground or reason different from that articulated by the trial court, with the apparent implication that we could affirm the decisions of the district court on the other constitutional grounds that Jones raised in her motions to quash and demurrers. An appellate court has the discretion to affirm, as it deems appropriate, a correct result that was reached below for the wrong reason.[70] However, remanding to the district court to consider issues it did not consider previously is especially appropriate when other motions remain pending for the district court's consideration. In our discretion, we find it better to have the district court rule on Jones' alternative arguments in the first instance and express no view on the merits of those alternative arguments at this time.

## VI. CONCLUSION

Because the district court misconstrued the UCA and erred to the extent it found the UCA void for vagueness, we reverse the orders of the district court sustaining Jones' pleas in abatement and dismissing the State's information and remand both causes for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

FREUDENBERG, J., not participating.

---

[70] *Saint James Apt. Partners v. Universal Surety Co.*, 316 Neb. 419, 5 N.W.3d 179 (2024).